THE STATE OF OHIO, APPELLEE, *v.* BETHEL, APPELLANT.

[Cite as *State v. Bethel,* 110 Ohio St.3d 416, 2006-Ohio-4853.]

(No. 2003–1766—Submitted November 9, 2005—Decided October 4, 2006.)

PFEIFER, J.

{¶ 1} On June 25, 1996, James Reynolds and his girlfriend, Shannon Hawks, were shot to death in an isolated field in Columbus. Appellant, Robert W. Bethel, was convicted of the aggravated murders of Reynolds and Hawks and was sentenced to death.

{¶ 2} Bethel was a member of the Crips street gang, as was Bethel's friend Jeremy Chavis. Tyrone Green and Donald Langbein were also members of the Crips gang. Jeremy's brother, Cheveldes Chavis, although a member of a different gang, "hung with" Jeremy, Langbein, Green, and Bethel. In the latter part of 1996, Bethel, Langbein, and the Chavis brothers lived together in a trailer on West Run Street in Columbus.

{¶ 3} Langbein is a cousin of the Chavis brothers; they have a grandfather in common. Their grandfather kept a garden in a field located behind 562 Stambaugh Road in Columbus ("the Stambaugh field"). Langbein and Jeremy Chavis sometimes went to that field to shoot guns.

{¶ 4} In 1995, Tyrone Green shot Rodney Cain to death during a burglary. James Reynolds and Donald Pryor were also involved in the burglary. Reynolds later told Pryor that he had seen Green shoot Cain. Pryor repeated Reynolds's story to the police.

{¶ 5} Green was subsequently indicted for aggravated murder with death specifications. During the discovery process in Green's case, the state gave Green's attorney supplemental discovery materials that included a copy of a search warrant with its supporting affidavit. The affidavit stated that Reynolds had told Pryor that Green had shot the victim. The state sent the supplemental discovery materials to Green's attorney on May 29, 1996, about four weeks before Reynolds and Hawks were murdered.

{¶ 6} Langbein testified that he and Bethel had been concerned about the witnesses against Green and that they had discussed "tak[ing] steps to get rid of them." On June 13, 1996, about two weeks before Reynolds and Hawks were murdered, Bethel and Cheveldes Chavis each bought a Maverick Model 88 12–gauge shotgun from Hamilton's Gun Shop in Obetz.

{¶ 7} According to Langbein, the day before the bodies of Reynolds and Hawks were discovered, a group of people "from the neighborhood," including Reynolds,

gathered on the corner of 4th and Morrill to hang out. Langbein, Bethel, and the Chavises arrived around 2:00 p.m. in Bethel's car.

{¶ 8} When Langbein was ready to leave, he offered Reynolds a ride home, because Reynolds lived near him. But Bethel and Jeremy Chavis said they would drive Reynolds home, even though Reynolds did not live near Jeremy. Langbein saw Reynolds and Hawks with Bethel and Jeremy in Bethel's car.

{¶ 9} Traci Queen, f.k.a. Traci Jordan, was a friend of Shannon Hawks. Queen recalled Hawks's and Reynolds's visiting her sometime between 3:00 and 5:00 p.m. the day before their deaths were reported on a news broadcast. When they entered Queen's home, Reynolds looked at his pager and went into the kitchen to use the phone. Hawks told Queen that she and Reynolds were "going to go out and shoot guns." She invited Queen to come along, but Queen declined.

{¶ 10} When Reynolds emerged from the kitchen, he and Hawks left the house and got into a car waiting in front of the house next door. Queen saw two other persons, who appeared to be male, in the front seat of that car. She never saw Hawks or Reynolds alive again.

{¶ 11} Ron Bass, who lived near the Stambaugh field, told police that sometime between 10:00 and 11:00 p.m., June 25, 1996, he heard five or six gunshots while lying in bed. Then he heard one louder gunshot, and after that another series of shots.

{¶ 12} On June 26, 1996, the bodies of Reynolds and Hawks were found lying in the Stambaugh field. They had been shot to death.

{¶ 13} Reynolds had been shot ten times, four times in the head. Reynolds also had one neck wound. One of the gunshots fired into Reynolds's head, from a distance of six inches to three feet, would have killed him at once. Five bullets were recovered from Reynolds's body, all of which could have been fired from a 9 mm firearm. Reynolds also had one wound caused by a shotgun slug fired into his back.

{¶ 14} Hawks was shot four times, twice in the head. One of the head wounds was a back-to-front wound through her brain. This wound would have incapacitated Hawks almost immediately. The other head wound entered Hawks's right cheek and exited through her left ear. Stippling indicated that this shot was fired from a distance of two to four feet.

{¶ 15} At the crime scene, police recovered twenty 9 mm shell casings and ten 12-gauge shotgun shell casings. The murder weapons were never found.

{¶ 16} Reynolds was the sole eyewitness known to the prosecuting attorney in Tyrone Green's aggravated-murder case. After Reynolds was murdered, Green was offered a plea bargain to a reduced charge of manslaughter.

{¶ 17} A couple of weeks after the murders, Bethel told Langbein that Bethel, Jeremy Chavis, "Doughboy" (Reynolds), and Hawks had been "partying" in the field where Langbein's grandfather kept a garden. Bethel told Langbein that he drew a 9 mm pistol and began firing at Reynolds and Hawks. After emptying his clip, Bethel reloaded and continued to shoot Reynolds and Hawks. Bethel told Langbein that Jeremy Chavis shot Reynolds in the back with a shotgun. Langbein stated that in later conversations, Bethel expressed concern about being caught.

{¶ 18} Some time before January 1997, Bethel told his girlfriend Theresa Campbell, f.k.a. Theresa Cobb, about the murders. He told her that on the night of the murders, he, Jeremy Chavis, Reynolds, and Hawks went to "practice shooting guns." He said he "had a feeling to shoot" and shot Reynolds 'and Hawks "because he felt like it." Bethel told her that he had laughed and then called Jeremy over to "see what he had done." According to Campbell, when Jeremy Chavis saw what Bethel had done, Chavis began to cry and went back to the car. Bethel then reloaded his gun and continued to shoot. Bethel told Campbell that he "couldn't stop shooting," and that when Chavis wanted to leave, Bethel "just stood there looking."

{¶ 19} In January 1997, police executed a search warrant at the trailer on West Run Street. There they found a Maverick Model 88 12–gauge shotgun belonging to Cheveldes Chavis. Bethel's identical shotgun was never found. This type of shotgun could have fired the type of shells found at the crime scene.

{¶ 20} Also found at the trailer was a gun box with a "Ruger" logo on the lid. Although the box contained no gun, it did contain an instruction manual for a 9 mm Ruger P95 semiautomatic pistol. According to Langbein, after the trailer was searched, Bethel became nervous about being caught and "started acting real weird."

{¶ 21} In 2000, Langbein was charged with an unrelated federal firearms violation. He told police and Bureau of Alcohol, Tobacco, and Firearms ("ATF") agents what he knew about the Reynolds–Hawks murders and agreed to wear a concealed tape recorder during conversations with Bethel.

{¶ 22} On October 19, 2000, Langbein and Bethel had a conversation at the Subway restaurant where Bethel worked. Langbein wore a recorder, and the Subway was under ATF surveillance. During this conversation, Bethel talked about the investigation. He told Langbein, "I wanted to talk to Jeremy * * * 'cause I knew the [police] were going to go down and * * * try and tell him some shit." Bethel believed that detectives had "been havin' phones tapped," and he was hesitant to talk anywhere "they got anything."

{¶ 23} On November 1, 2000, police executed a search warrant at 656 East Jenkins Street, Columbus. Although the record does not show who lived at this

address, some of the property seized pursuant to the warrant was later returned to Cheveldes Chavis. In a wastebasket at that site, police found papers with a cover sheet captioned "Supplemental Discovery" from the case of *State v. Tyrone Green.* Jeremy Chavis's fingerprints were found on that paper. In the same wastebasket, police found a copy of a search warrant given to Green during discovery in his case, along with its attached affidavit—the affidavit that named Reynolds as the source of Pryor's information.

{¶ 24} Bethel was arrested on November 6, 2000. He was indicted on two counts of aggravated murder under R.C. 2903.01(A) (prior calculation and design). Each count had two death specifications. The specifications for Count One, the murder of Shannon Hawks, alleged that the offense was committed to escape detection, apprehension, trial, or punishment for another offense committed by the offender, in violation of R.C. 2929.04(A)(3), and that it was part of a course of conduct involving the purposeful killing of two or more persons, in violation of R.C. 2929.04(A)(5). The specifications for Count Two, the murder of James Reynolds, were that Reynolds was killed to prevent his testimony in another criminal proceeding, in violation of R.C. 2929.04(A)(8), and that his murder was part of a course of conduct, in violation of R.C. 2929.04(A)(5).

{¶ 25} The trial court appointed Ronald B. Janes and W. Joseph Edwards as Bethel's counsel. After receiving discovery from the state, Janes and Edwards concluded that a death sentence was a strong possibility. Accordingly, they negotiated with the prosecutor's office to reach a plea bargain.

{¶ 26} At a meeting on August 29, 2000, Janes and Edwards discussed a proposed plea bargain with Bethel. Bethel's mother was also present with Sanford Cohan, an attorney she had hired. Janes and Edwards showed Bethel videotaped witness statements that they had received from the prosecution in discovery. After seeing these, Bethel softened his position and ultimately agreed to a plea bargain and to testify against Jeremy Chavis.

{¶ 27} As part of the bargain, Bethel agreed to make an "off-the-record" proffer of his testimony against Jeremy Chavis. The prosecutor prepared a proffer letter to clarify the ground rules for the proffer. The letter specifically provided that "no statements made or other information provided by your client during the 'off-the-record' proffer or discussion will be used against your client in any criminal case." The state reserved the right to make derivative use of Bethel's statement and to use it on cross-examination if his testimony was inconsistent with his proffer.

{¶ 28} On August 30, 2000, Bethel was taken to the Franklin County Sheriff's Office. There, in the presence of his attorney, Bethel signed the proffer letter. Bethel then made a statement that was tape-recorded.

{¶ 29} In his proffer, Bethel stated that killing Reynolds had been Jeremy Chavis's idea. Before the murders, Bethel said, he and Chavis discussed what they were going to do. After this conversation, they picked up Reynolds and Hawks and drove to the field belonging to Chavis's grandfather, where Bethel and others sometimes went to fire guns or to just hang out.

{¶ 30} When they got to the field, the four got out of the car and walked through some trees to a clearing. Bethel had a 9 mm handgun; Chavis had the 12–gauge shotgun that Bethel had purchased. A few shots were fired into the air. Bethel and Chavis then turned their guns on Reynolds and Hawks.

{¶ 31} Reynolds and Hawks were standing together; Reynolds had his arm around Hawks. Bethel claimed that he and Chavis simultaneously fired their guns at Reynolds and Hawks from a distance of 30 to 40 feet. The two victims fell to the ground. Bethel emptied the clip of his handgun.

{¶ 32} According to Bethel, he thought that Reynolds and Hawks were probably dead, so he said, "Let's go." But Chavis wanted to "make sure." Chavis gave Bethel a fresh clip containing "maybe" six rounds. Bethel then walked over to the victims and emptied the second clip into them at "close range."

{¶ 33} On August 30, 2001, after making the proffer, Bethel entered into a plea agreement with the state. The agreement was embodied in a three-page document signed by Bethel, his attorneys, and the prosecutors and filed with the trial court. Bethel discussed the terms with his attorneys for 30 to 45 minutes before signing.

{¶ 34} Bethel agreed to plead to two counts of aggravated murder with firearm specifications. He further agreed to cooperate with the investigation and to testify truthfully against Jeremy Chavis and anyone else involved in killing Reynolds and Hawks. In return, the state agreed to dismiss the death specifications.

{¶ 35} The agreement contained a specific provision dealing with Bethel's proffer:

{¶ 36} "1. Defendant and the State agree that the proffer taken of the defendant on August 30, 2001 will be admissible in a criminal trial against the defendant in the event that the defendant does not abide by the terms and conditions of this agreement set forth below."

{¶ 37} The agreement also included the following provision:

{¶ 38} "6. * * * Should it be judged by the Franklin County Prosecutor's Office at any time that the defendant has failed to cooperate fully; refused to testify or testifies falsely in any proceeding(s); has intentionally given false, misleading or incomplete information or testimony; or has otherwise violated any

provision of this agreement, then the Franklin County Prosecutor's Office may declare this Agreement null and void. The Franklin County Prosecutor's Office may then automatically reinstate the original charges against the defendant, as well as file any additional charges. * * * In the event this Agreement becomes null and void, then the parties will be returned to the position they were in before this Agreement."

{¶ 39} After the parties signed the agreement, the trial court held a closed hearing. The terms of the agreement were placed on record, and Bethel confirmed that he understood them. The trial court accepted the agreement and placed it in the record under seal. After a recess, and in open court, the trial court accepted Bethel's plea of guilty to two counts of aggravated murder with gun specifications.

{¶ 40} On November 13, 2001, Bethel refused to testify against Jeremy Chavis. On December 18, 2001, the state filed a motion to have the plea agreement declared void. The trial court granted the state's motion, thereby reinstating the charges. Janes and Edwards withdrew from the case on December 3, 2001, and Bethel was assigned other counsel.

{¶ 41} Bethel filed a motion to suppress his proffer. His former counsel, Janes and Edwards, testified at the motion hearing. The trial judge denied the motion and allowed the state to introduce Bethel's proffer into evidence.

{¶ 42} At trial, Bethel expressly denied his guilt. In his testimony, he repudiated the proffer, claiming that he had lied in order to obtain the benefit of the plea bargain. He admitted that he had never intended to fulfill his end of the bargain by testifying against Chavis, but claimed that he had merely wanted to delay his trial because he felt that Janes and Edwards were unprepared. He claimed to have believed the proffer could not be used against him at trial even if he violated the agreement.

{¶ 43} Bethel admitted that Reynolds and Hawks had been in his car after the gathering at 4th and Morrill, but he claimed to have dropped them off on the west side of Columbus around 9:00 p.m. Bethel and his mother, Deborah Bibler, testified that Bethel and Chavis had been at Bibler's house on the south side of Columbus between 10:00 and 11:00 p.m., June 25, 1996, at the time that Ron Bass heard the gunshots.

{¶ 44} The jury found Bethel guilty of all charges and specifications. After a penalty hearing, the jury recommended death sentences for both killings, and the trial court sentenced Bethel to death. The cause is now before us upon an appeal as of right.

{¶ 45} In this appeal, Bethel sets forth 20 propositions of law, each devoid of merit. We overrule his propositions of law and affirm his convictions and his sentences of death.

## I. *Bethel's Proffer*

### A. The Plea Agreement

{¶ 46} Paragraph One of the plea agreement specifically provided that "the proffer taken of the defendant on August 30, 2001 will be admissible in a criminal trial against the defendant in the event that the defendant does not abide by the terms and conditions of this agreement * * *." In his first proposition of law, Bethel contends that, despite the seemingly clear language of the first paragraph, once the plea agreement was declared void, the state could not use his proffer against him at trial. Thus, he contends, its introduction into evidence violated the plea agreement.

{¶ 47} According to Bethel, Paragraph One is meaningless. He argues that Paragraph Six of the agreement permitted the charges to be reinstated *only* if the prosecutor declared the entire agreement void. And if the entire agreement was void, Bethel argues, Paragraph One was also void and could not be enforced.

{¶ 48} Bethel argues that his interpretation is supported by the following sentence in Paragraph Six: "In the event this Agreement becomes null and void, then the parties *will be returned to the position they were in before this Agreement*." According to Bethel, returning the parties to their pre-agreement position means that the proffer letter, which preceded the agreement, controlled the state's use of the proffer. And under the terms of the proffer letter, the state could have introduced Bethel's proffer only in order to impeach his testimony, if necessary.

{¶ 49} If Bethel's construction of the agreement is correct, it is clear that under no circumstances could Paragraph One ever be implemented. Bethel agrees that this is so. Indeed, his brief expressly contends that the null-and-void language of Paragraph Six renders Paragraph One meaningless.

{¶ 50} Principles of contract law are generally applicable to the interpretation and enforcement of plea agreements. See, generally, *United States v. Wells* (C.A.6, 2000), 211 F.3d 988, 995. Bethel's proposed interpretation of the agreement is at odds with a basic principle of contract law: "In the construction of a contract courts should give effect, if possible, to *every* provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction *must* obtain." (Emphasis added.) *Farmers' Natl. Bank v. Delaware Ins. Co.* (1911), 83 Ohio St. 309, 94 N.E. 834, paragraph six of the syllabus.

{¶ 51} This well-settled principle applies to plea agreements. *United States v. Rourke* (C.A.7, 1996), 74 F.3d 802, 807; see, also, *United States v. Brye* (C.A.10, 1998), 146 F.3d 1207, 1211 (rejecting interpretation that would render part of plea agreement superfluous). Thus, an interpretation that would render a provision meaningless—as Bethel's proposed interpretation would—"is neither acceptable nor desirable under the normal rules of contract construction." *Hybud Equip. Corp. v. Sphere Drake Ins. Co.* (1992), 64 Ohio St.3d 657, 666, 597 N.E.2d 1096.

{¶ 52} Pointing out that the state drafted the plea agreement in this case, Bethel cites the well-known principle that ambiguities in a plea agreement are to be construed against the state. See *United States v. Johnson* (C.A.6, 1992), 979 F.2d 396, 399.

{¶ 53} However, the cited principle applies only to ambiguous agreements or portions of agreements. It has no application here, because there is no ambiguity in the agreement before us. An agreement is ambiguous if it is "subject to more than one reasonable interpretation." *Hillsboro v. Fraternal Order of Police, Ohio Labor Council, Inc.* (1990), 52 Ohio St.3d 174, 177, 556 N.E.2d 1186. Accord *United States v. Gebbie* (C.A.3, 2002), 294 F.3d 540, 551 (plea agreement). Given the clear language of Paragraph One, and the need to ensure that the paragraph is not rendered meaningless, the agreement before us is subject to only one reasonable interpretation. The breach by Bethel voided the plea agreement and returned the parties to their previous position as stated in Paragraph Six, except that Bethel's proffer could then be used against him, as plainly provided by Paragraph One. This construction addresses the entire agreement and avoids the incorrect result of rendering Paragraph One meaningless.

{¶ 54} Bethel's plea agreement clearly provided that the state could use Bethel's proffer at trial if Bethel breached the agreement. Hence, the state did not violate the agreement by introducing the proffer. Bethel's first proposition of law is therefore overruled.

## B. Evid.R. 410(A)

{¶ 55} Evid.R. 410(A)(5) provides that "any statement made in the course of plea discussions in which counsel for the prosecuting authority or for the defendant was a participant and * * * that result in a plea of guilty later withdrawn" is not admissible "against the defendant who made the plea or who was a participant personally or through counsel in the plea discussions." In his second proposition of law, Bethel claims that the admission of his plea agreement and proffer violated Evid.R. 410(A)(5). However, since Bethel specifically agreed that his proffer could be admitted into evidence against him in the event that he breached the plea agreement, he has waived any claim under Evid.R. 410(A)(5).

{¶ 56} Evid.R. 410(A)(1) provides that a withdrawn plea of guilty is inadmissible. Evid.R. 410(A)(4) provides that any statement made during proceedings under Crim.R. 11 regarding a plea is inadmissible. Bethel claims that the state violated these rules at trial when it elicited testimony that he had previously entered a plea of guilty in this case. Columbus Police Detective Edward Kallay gave the following testimony on redirect examination:

{¶ 57} "Q. * * * After the proffer, was there a plea agreement in this case?

{¶ 58} "A. Yes, sir.

{¶ 59} "Q. Signed by the defendant?

{¶ 60} "A. Yes, sir.

{¶ 61} "* * *

{¶ 62} "Q. Plea in this case in open court?

{¶ 63} "A. Yes, sir, there was a plea."

{¶ 64} Bethel did not object to this evidence at trial. Further, defendant's attorneys first inserted the issue of the guilty plea into the case, in opening statement. This issue, raised in defendant's second proposition of law, is therefore waived.

## C. Knowing and Voluntary Waiver

{¶ 65} In his 19th proposition of law, Bethel contends that when he entered into the plea agreement, he did not understand that it allowed the state to use his proffer against him if he breached the agreement. Thus, he claims that he did not knowingly, voluntarily, and intelligently waive his Fifth Amendment right against self-incrimination, and his proffer should have been suppressed.

{¶ 66} At the suppression hearing, both Edwards and Janes testified that they explained the agreement to Bethel and that he understood it, including the first paragraph. Both attorneys understood the agreement to mean that if Bethel violated it, his proffer could be used against him at trial. Edwards specifically explained to Bethel that the proffer was no longer off the record once he signed the plea agreement. "I just specifically said to him, Bobby, if you sign this agreement, then if you back out, meaning you don't testify against Jeremy, or if you testify untruthfully, * * * not only will the deal be revoked but then they're going to have this statement to be used against you."

{¶ 67} Bethel denied that he understood that the agreement would allow the use of his proffered statements. He testified that Janes and Edwards told him that Paragraph One was meaningless and that it left him free to renege with no adverse consequences other than reinstatement of the original charges.

{¶ 68} The trial court found that Janes and Edwards were credible and that Bethel was not. The court specifically found that "Bethel understood and agreed

to the plea agreement," that Janes and Edwards did not advise Bethel to lie about his willingness to testify, and that "Bethel understood the potential uses of the proffer, and [understood that] pursuant to the plea agreement the prosecution [was permitted to] use the proffer against Bethel in a trial on the original charges."

{¶ 69} "Voluntariness is a legal question for a reviewing court to determine independently. * * * However, this court must defer to the trial court's *factual* findings, if those are supported by the record." (Emphasis sic.) *State v. Keene* (1998), 81 Ohio St.3d 646, 656, 693 N.E.2d 246. The testimony of Janes and Edwards amply supports the trial court's findings of fact. On the basis of those findings, we conclude that Bethel knowingly, voluntarily, and intelligently entered into the plea agreement. Bethel was represented by counsel, who advised him of the consequences of breaching the agreement, and he understood those consequences.

### D. Lack of *Miranda* Warnings

{¶ 70} Bethel also claims that his proffer was inadmissible because it was not preceded by *Miranda* warnings. Bethel's claim under *Miranda* is waived, however, because he did not bring it to the attention of the trial court.

{¶ 71} In order to overcome this waiver, Bethel must show plain error under Crim.R. 52(B). An error is plain error only if it is obvious, *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, and, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. The trial court's failure to suppress the proffer on *Miranda* grounds was not plain error, as the error, if any, was neither obvious nor outcome-determinative.

{¶ 72} The outcome of Bethel's trial would not clearly have been different had the proffer been excluded, since Bethel had admitted his guilt to two of the state's witnesses, Langbein and Cobb.

{¶ 73} Nor do we find that the trial court's admission of the proffer was an obvious error. Bethel's attorneys were present during the proffer, and there is substantial authority for the proposition that *Miranda* warnings are not necessary when counsel is present. In *Miranda* itself, the United States Supreme Court observed that "[t]he presence of counsel, in all the cases before us today, would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege [against self-incrimination]." *Miranda v. Arizona* (1966), 384 U.S. 436, 466, 86 S.Ct. 1602, 16 L.Ed.2d 694. Indeed, it is generally accepted that the presence of counsel during interrogation "obviates the need for the warnings." 2 LaFave, Israel & King, Criminal Procedure (1999) 573, Section 6.8(e). See *United States v. Guariglia* (S.D.N.Y.

1991), 757 F.Supp. 259, 264; *Virgin Islands v. Ruiz* (D.V.I.1973), 354 F.Supp. 245, 247–248; *People v. Mounts* (Colo.1990), 784 P.2d 792, 795–796; *Collins v. State* (Del.1980), 420 A.2d 170, 176; *Baxter v. State* (1985), 254 Ga. 538, 543, 331 S.E.2d 561. Contra *State v. DeWeese* (2003), 213 W.Va. 339, 348–349, 582 S.E.2d 786; see *Sweeney v. Carter* (C.A.7, 2004), 361 F.3d 327, 331.

{¶ 74} Therefore, Bethel's 19th proposition of law is overruled.

### E. Imposing Death after Bethel Breached the Agreement

{¶ 75} In his ninth proposition of law, Bethel contends that imposition of the death sentence was arbitrary, given the trial court's willingness to accept his plea of guilty to a noncapital charge as part of the plea bargain. Bethel argues that by accepting his guilty plea to aggravated murder without death specifications, the trial court effectively determined that a sentence of life imprisonment was appropriate. Citing *Adamson v. Ricketts* (C.A.9, 1988), 865 F.2d 1011, 1022, Bethel contends that he was sentenced to death simply because he violated his plea agreement, not because he deserved a death sentence.

{¶ 76} We find *Adamson* unpersuasive. The trial court's acceptance of the plea agreement in this case did *not* necessarily imply that it considered a life sentence "appropriate." We concur in the view expressed by a different panel of the Ninth Circuit Court of Appeals in another capital case: "That the sentence imposed after trial is more severe than one the judge would have been willing to impose as part of a plea bargain does not * * * impeach the legitimacy of the sentence. * * * [T]he judge could well have approved a settlement calling for a sentence lighter than he himself would have chosen to impose." *McKenzie v. Risley* (C.A.9, 1988), 842 F.2d 1525, 1537. The reasoning of *McKenzie* is consistent with our own reasoning in *State v. Webb* (1994), 70 Ohio St.3d 325, 336, 638 N.E.2d 1023, that a prosecutor's offer of a plea bargain to a capital defendant did not constitute a concession by the prosecutor that a death sentence was inappropriate. Bethel's ninth proposition of law is therefore overruled.

### F. Prosecutorial Vindictiveness

{¶ 77} In his tenth proposition of law, Bethel claims to be a victim of "prosecutorial vindictiveness." See, generally, *Blackledge v. Perry* (1974), 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (prosecutor may not retaliate against defendant for exercising right to appeal). Bethel argues that in refusing to testify against Chavis, he was exercising his constitutional right to remain silent. He contends that reinstatement of the original charges in response to his refusal to testify amounted to retaliation for his exercise of that right.

{¶ 78} Bethel's claim lacks merit. "[W]hen a plea agreement is vacated, no presumption of vindictiveness arises when the prosecutor simply reinstates the indictment that was in effect before the plea agreement was entered." *Taylor v.*

*Kincheloe* (C.A.9, 1990), 920 F.2d 599, 606. Accord *United States v. Anderson* (C.A.7, 1975), 514 F.2d 583, 588. When a defendant goes back on his promise, "it is hardly surprising, and scarcely suggestive of vindictiveness, that the district attorney in turn withdr[aws] his consent to the reduced charge." *United States ex rel. Williams v. McMann* (C.A.2, 1970), 436 F.2d 103, 106.

{¶ 79} In essence, Bethel claims a constitutional right to renege on his plea agreement, retain the benefit of the bargain that he broke, and avoid the agreed sanction for his breach. We decline to create such a right. To do so "would encourage gamesmanship of a most offensive nature. Defendants would be rewarded for prevailing upon the prosecutor to accept a reduced charge and to recommend a lighter punishment in return for a guilty plea, when the defendant intended at the time he entered that plea to attack it at some future date. * * * This is nothing more than a 'heads-I-win-tails-you-lose' gamble." Id. at 106–107. Bethel's tenth proposition is overruled.

## II. *Nonpublic Proceeding to Determine Defendant's Understanding of Plea Agreement*

{¶ 80} In his third proposition of law, Bethel contends that he should receive a new trial because a hearing in which the plea agreement was discussed was closed to the public.

### A. Constitutional Issues

{¶ 81} The right to a public trial is guaranteed by the Sixth Amendment to the United States Constitution and by Section 10, Article I of the Ohio Constitution. Although Bethel did not object to the closing of the hearing, the right to a public trial under Section 10, Article I of the Ohio Constitution cannot be waived by the defendant's silence. *State v. Hensley* (1906), 75 Ohio St. 255, 266, 79 N.E. 462. Nor does anything in the record show that the defense consented to the closing of the hearing. Cf. *State v. Bayless* (1976), 48 Ohio St.2d 73, 110, 2 O.O.3d 249, 357 N.E.2d 1035 (waiver by consent of defense counsel); *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 64 (error invited by defense counsel).

{¶ 82} The violation of the right to a public trial is a structural error. It is not subjected to harmless-error analysis. *Waller v. Georgia* (1984), 467 U.S. 39, 49–50, 104 S.Ct. 2210, 81 L.Ed.2d 31. In *Waller*, the court held that in order to justify closure of a hearing in a criminal case, "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." 467 U.S. at 48, 104 S.Ct. 2210, 81 L.Ed.2d 31.

{¶ 83} The record in this case does not show that any of these requirements were addressed. Thus, it does not appear that the closing of the hearing was justified. Bethel argues that because the closing of the hearing was unjustified, he is entitled to a new trial. We disagree.

{¶ 84} In *Waller*, a suppression hearing was improperly closed. The remedy, however, was not a new trial, but a new suppression hearing: "[T]he remedy should be appropriate to the violation. * * * A new trial need be held only if a new, public suppression hearing results in the suppression of material evidence not suppressed at the first trial, or in some other material change in the positions of the parties." 467 U.S. at 49–50, 104 S.Ct. 2210, 81 L.Ed.2d 31.

{¶ 85} Therefore, the remedy for the improper closing of the hearing in this case would be a new, public *hearing*. A new trial would follow only if the new hearing resulted in some "material change in the positions of the parties."

{¶ 86} However, under the present circumstances, a new hearing could not result in any change. The purpose of the hearing was to ensure that Bethel understood the terms of the plea agreement before he entered a plea. This purpose no longer has any relevance. Bethel's guilty plea was withdrawn. The plea agreement was voided by Bethel's breach.

{¶ 87} Because a new hearing could not materially change the position of the parties, there is no need for either a new hearing or a new trial. A new hearing would be an empty formality; a new trial would be a "windfall." *Waller*, 467 U.S. at 49, 104 S.Ct. 2210, 81 L.Ed.2d 31. Accordingly, we overrule Bethel's third proposition of law.

## B. Crim.R. 11(F)

{¶ 88} Crim.R. 11(F) provides that when a negotiated plea of guilty is offered in a felony case, "the underlying agreement upon which the plea is based shall be stated on the record in open court." In this case, the underlying agreement was stated on the record, but not in "open court," as the court was closed while the plea agreement was being discussed.

{¶ 89} However, Bethel did not object to the closure of the courtroom during the discussion of the plea agreement. While Bethel's silence did not waive his constitutional right to a public trial, see *State v. Hensley* (1906), 75 Ohio St. 255, 266, 79 N.E. 462, a contemporaneous objection is necessary to preserve error for appellate review of a violation of Crim.R. 11(F).

{¶ 90} Thus, Bethel cannot prevail on his claim under Crim.R. 11(F) unless he shows plain error. To do this, he must show that the outcome of the trial clearly would have been otherwise without the alleged error. *State v. Long*, 53 Ohio St.2d at 97, 7 O.O.3d 178, 372 N.E.2d 804. Bethel does not explain how he was prejudiced by the trial court's violation of Crim.R. 11(F). Cf. *State v. Spivey*

(1998), 81 Ohio St.3d 405, 418, 692 N.E.2d 151 (violation of Crim.R. 11(F) not prejudicial where terms of the plea were stated on the record in chambers). We overrule Bethel's fifth proposition of law.

### III. *Evidentiary Issues*

#### A. Gang-Affiliation Evidence

{¶ 91} State's witness Donald Langbein testified that Bethel was a member of the Crips street gang. Langbein also identified a photograph of himself and Bethel making hand signals that, according to Langbein, were "gang signs" of the Crips. This photo was published to the jury after Langbein identified it. In his seventh and eighth propositions of law, Bethel claims that this evidence was inadmissible.

{¶ 92} Bethel did not object to the gang-affiliation testimony at trial. Nor did he object to the photo when Langbein identified it in court, even though it was published to the jury at that time. He objected only *after* the state's case had concluded, when the court was considering the admission of exhibits. Bethel's failure to timely object to the testimony, or to the photo, waives the issues raised in his seventh and eighth propositions of law. We overrule these propositions.

#### B. Tape-Recorded Conversations

{¶ 93} In his 18th proposition of law, Bethel contends that the trial court erred when it refused to provide State's Exhibit T–1, the tape recording of the Bethel–Langbein conversation on October 19, 2000, to the jury.

{¶ 94} Parts of the tape were played during the state's case and during Bethel's cross-examination. However, the tape was never offered nor formally admitted into evidence. During its guilt-phase deliberations, the jury requested the tape. Before responding, the trial court consulted counsel for both parties, and they agreed that the appropriate response was "[Y]ou have all of the evidence which has been admitted." Accordingly, the trial court told the jury: "You have everything you need. * * * [Y]ou have everything that's been admitted into evidence, and the rest you will have to rely on your collective memory for."

{¶ 95} Since the defense did not object and agreed that this was the appropriate response to the jury's request for the tape, the issue is waived. See *State v. Campbell* (2000), 90 Ohio St.3d 320, 324, 738 N.E.2d 1178. Neither did the trial court commit plain error. When the jury asks to see an exhibit, it is within the trial court's discretion to grant or deny that request. See *State v. McGuire* (1997), 80 Ohio St.3d 390, 396, 686 N.E.2d 1112; *State v. Clark* (1988), 38 Ohio St.3d 252, 257, 527 N.E.2d 844. "The term 'abuse of discretion' * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v.*

*Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144, citing *Steiner v. Custer* (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E.2d 855. The trial court's refusal to send the tape to the jury was not unreasonable, arbitrary, or unconscionable.

{¶ 96} Bethel also claims that the trial court, having allowed the state to play parts of one tape, should have allowed the defense to play tapes of *other* conversations between Bethel and Langbein during Langbein's cross-examination. Bethel argues that excluding the other tapes violated Evid.R. 106: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which is otherwise admissible and which ought in fairness to be considered contemporaneously with it."

{¶ 97} However, Bethel did not proffer the tapes he wanted the jury to hear at his trial. Because the other tapes are not in the record, we cannot determine whether they should in fairness "be considered contemporaneously with" Exhibit T–1. See *State v. Webb,* 70 Ohio St.3d at 337, 638 N.E.2d 1023. Hence, Bethel has also failed to preserve this issue.

{¶ 98} Bethel also argues that the exclusion of the other conversations violated his right to confront Langbein with statements made by Langbein during those conversations. But at trial Bethel did not argue that he was entitled to use the tapes to confront Langbein with *Langbein's* statements. Bethel argued only that the jury should hear the tapes because they contained *Bethel's* denials of involvement in the murders. Bethel's confrontation claim is waived by his failure to present it to the trial court as well as by his failure to proffer the tapes.

{¶ 99} Because the issues presented by Bethel's 18th proposition of law were not preserved at trial, we overrule that proposition.

## C. Weight and Sufficiency of the Evidence

{¶ 100} In his 16th proposition of law, Bethel contends that the verdict was against the manifest weight of the evidence. See R.C. 2953.02. A court considering a manifest-weight claim "review[s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses." *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. The question to be determined is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 101} The key evidence supporting Bethel's conviction was his own statements to Langbein and Campbell and his proffer of August 30, 2001. On each occasion, Bethel admitted killing Reynolds and Hawks with a 9 mm handgun.

{¶ 102} Langbein also testified, and Bethel admitted, that Bethel offered to take Reynolds home on June 25, 1996. A friend of Hawks testified that the last time she saw Hawks and Reynolds, they were getting into Bethel's car. Bethel also admits that he picked up Hawks at some point on June 25, 1996, but claims that he dropped off both victims at a Kentucky Fried Chicken restaurant.

{¶ 103} Bethel had purchased a shotgun like the one used in the murders less than two weeks earlier. While police found a similar shotgun purchased by Bethel's friend during a search of Bethel's trailer, Bethel's shotgun was never located. Bethel claimed that it had been stolen.

{¶ 104} When police searched the home of Cheveldes Chavis (Jeremy's brother and Bethel's friend), they found a document captioned "Supplemental Discovery," which had Jeremy Chavis's fingerprints on it, and a copy of an affidavit in Tyrone Green's aggravated-murder case that claimed that Reynolds said that he had seen Green shoot a man.

{¶ 105} Bethel's proffer, explaining how the murders were committed, supports a finding of prior calculation and design. Bethel admitted that before picking up Reynolds and Hawks, he and Jeremy discussed what they were going to do. After Bethel fired an entire clip at Reynolds and Hawks, Bethel accepted a fresh clip from Jeremy, reloaded, approached the victims, and emptied a second clip into them from close range.

{¶ 106} The autopsies showed that Reynolds was shot ten times, once with a shotgun, and Hawks was shot four times. Nine-millimeter bullets were recovered from both bodies. Reynolds had four head wounds, at least one of which was inflicted at close range. Hawks had two head wounds, at least one of which was inflicted at close range. These wounds confirm Bethel's statement in his proffer that he fired several shots at Reynolds and Hawks from a distance, approached them as they lay on the ground, and shot them again at close range.

{¶ 107} Bethel argues that the account in his proffer is inconsistent with the victims' wounds and the crime-scene evidence. However, his claims are vague and largely conjectural. Bethel claims that *some* of the victims' wounds could not have been inflicted from a distance of 30 to 40 feet. But this fact is not inconsistent with Bethel's proffer; Bethel never said he fired *all* his shots from that distance. Rather, after firing his initial fusillade, he reloaded his gun, approached the victims, and shot them at close range.

{¶ 108} Bethel's argument that his proffer is inconsistent with the physical evidence is partially based on wound angles that he claims are inconsistent with

those from shots fired at a distance. However, his argument assumes that the victims were standing upright when these wounds were inflicted. Bethel fails to take into account his own admission that the victims fell to the ground when they were shot.

{¶ 109} Bethel also argues that the lack of bleeding from Reynolds's shotgun wound indicates that this wound was inflicted after Reynolds's death and that this evidence is inconsistent with the proffer, which states that Chavis fired his shotgun at the same time Bethel began firing. However, the coroner testified that the wound could have been inflicted either *"very soon before* or immediately after" Reynolds's fatal head wound. (Emphasis added.)

{¶ 110} Bethel argues in his brief that his statement to Campbell placed Chavis in the car during the shootings, thus contradicting his other statements that Chavis fired the shotgun. But there is no contradiction. The Campbell statement does not place Chavis in the car during the *entire* crime. To the contrary, Campbell testified that Bethel told her that Chavis "started crying and *went* to the car" after the initial shooting. (Emphasis added.)

{¶ 111} This is not a case in which the evidence weighs heavily against conviction; the jury's verdict was not a manifest miscarriage of justice. *Martin*, 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717. Rather, it is a case in which the defendant admitted guilt on three separate occasions, in which those admissions are fully consistent with the physical evidence, and in which the defendant had a strong motive to kill the victims. We overrule Bethel's 16th proposition of law.

{¶ 112} In his 17th proposition of law, Bethel contends that the evidence was legally insufficient to support his conviction. The test of sufficiency of the evidence is whether a rational trier of fact, viewing the evidence in the light most favorable to the state, could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 309, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 113} Bethel's statements provide legally sufficient evidence of his guilt. Bethel's 17th proposition of law is overruled.

## IV. *Voir Dire*

{¶ 114} In his 15th proposition of law, Bethel identifies ten prospective jurors who were excused for cause because the trial court concluded that their difficulties with capital punishment rendered them unable to fairly consider the death penalty. Bethel contends that each of these excusals was improper. Bethel also claims that the trial court erroneously overruled his challenges of two prospective jurors for cause.

## A. Prosecution Challenges for Cause

{¶ 115} In each case for which Bethel alleges that the trial court improperly excused a venireman for cause, Bethel objected to the excusal. Nevertheless, the state argues that Bethel waived all but plain error by failing to state specific grounds for his objections.

{¶ 116} Bethel based his objections as to four veniremen, Eaton, Johnston, O'Harra, and Carpenter, solely on his claim that death qualification is unconstitutional. He articulated no other objection to excusing these veniremen for cause. Bethel has thus waived any objections based on other grounds, such as the voir dire responses of the veniremen in question.

{¶ 117} The state's contention is incorrect with regard to the other six prospective jurors. In the cases of Shultz, Rhatigan, Poindexter, and Hilty, Bethel specifically objected to excusal on the grounds that the prospective juror's voir dire responses did not support a challenge for cause. Therefore, these objections were not waived.

{¶ 118} A juror may be excused for cause if his views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581; *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 40. A trial court's resolution of a challenge for cause will be upheld on appeal unless it is unsupported by substantial testimony. *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915.

{¶ 119} Venireman Rhatigan never stated that she was categorically opposed to capital punishment. Asked whether she would give capital punishment "a fair shake," she said: "I think maybe. But it would be very difficult." She did not know whether she could sign a death verdict. She thought "maybe" she could follow the law, but "wouldn't promise" to do so. Later, she said she would try to be fair and to follow the law, but "with only two murders I would be predisposed to weigh the mitigating factors more heavily." She reiterated that it would be very difficult to sign a death verdict, although she allowed that it was "possible" that she would do so.

{¶ 120} Rhatigan's refusal to promise to follow the law and fairly consider a death sentence supports a finding that her ability to follow the law was substantially impaired. Thus, the record supports the trial court's decision to excuse her for cause.

{¶ 121} Venireman Shultz was "completely against" capital punishment, although he believed that some people deserved it. Even though he "would do whatever [he was] charged to do legally," he did not think that he could sign a death verdict.

{¶ 122} In response to a question by defense counsel, Shultz mentioned Susan Smith and Timothy McVeigh as examples of persons who deserved the death penalty. Asked whether he could have voted for a death sentence in the Susan Smith case, Shultz said: "My mind is telling me yes *right now*." (Emphasis added.) He said he could "absolutely" follow the judge's instructions "as a civic duty" and could consider each of the possible sentences.

{¶ 123} Shultz's final statements, viewed in isolation, do not suggest impairment. "However, where a prospective juror gives contradictory answers on voir dire, the trial judge need not accept the last answer elicited by counsel as the prospective juror's definitive word. * * * Rather, 'it is for the trial court to determine which answer reflects the juror's true state of mind.'" *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 66, quoting *State v. Jones* (2001), 91 Ohio St.3d 335, 339, 744 N.E.2d 1163. Shultz had already said that he was completely against capital punishment, even though he claimed he could follow the judge's instructions. Thus, substantial testimony supported excluding Shultz. The trial judge did not abuse his discretion by so doing. See *State v. Webb*, 70 Ohio St.3d at 339, 638 N.E.2d 1023.

{¶ 124} Poindexter and Hilty also gave contradictory answers. Poindexter was not completely against capital punishment. However, she said on voir dire that she could not and "probably wouldn't sign" a death verdict if she were the last juror to sign the verdict form. She also said that "maybe" she could do it after hearing the evidence, but that she did not know. Later she said that she could follow the trial court's instructions and "would have to" vote for a death sentence if the state proved its case. She stated that she could sign a death verdict, although she did not retract her earlier statement that she could not provide the final signature. The trial judge granted the state's challenge for cause because Poindexter "said everything on both sides of this issue."

{¶ 125} Hilty initially said she possibly could sign a death verdict, but then said: "I couldn't do it." Later, she said, "I guess I could do it."

{¶ 126} The record supports the trial judge's decision to grant these challenges. Both Poindexter and Hilty expressed severe doubts about their ability to participate in a death sentence. The record justifies a finding that their ability to perform in accordance with their instructions and oath was substantially impaired. To the extent that they contradicted themselves on this point, the trial judge's resolution of the question is entitled to deference. *Webb*, supra.

{¶ 127} Finally, although Bethel did not state specific grounds for objecting to the excusals of Hackney and Stynchula, the basis of Bethel's objections can be fairly discerned from the record. Hence, Bethel's objections to these excusals were not waived.

{¶ 128} These challenges were also properly granted under the substantial-impairment standard. Hackney believed that she could follow the law, although it would be difficult. But she said she could not actually sign a death verdict, even if that was "the right thing to do." Signing would make her feel guilty: "[M]orally, I would have a real hard time dealing with it." The only circumstance in which she would be willing to sign would be when a defendant had committed a murder in prison.

{¶ 129} Stynchula was not challenged for cause by either party during the death-qualification voir dire. However, two days later, she disclosed, without prompting, that she did not know whether she could sign a death verdict. She said: "[T]he past two days just thinking and thinking of it just gives me a—gets me in the pit of my stomach." She even worried that she might be excommunicated from her church if she signed a death verdict.

{¶ 130} We hold that the trial court's decision to excuse these six prospective jurors for cause was supported by substantial testimony. In each case, voir dire provided a sufficient basis for the trial court to conclude that the juror's views on capital punishment would either prevent or substantially impair the performance of the juror's duties in accordance with his instructions and oath.

## B. Defense Challenges for Cause

{¶ 131} A defendant has a constitutional right to exclude for cause any prospective juror who will automatically vote for the death penalty. *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492. Bethel challenged veniremen Ford and Collier for cause on this basis. The trial court overruled both challenges, although it sustained several other challenges for cause by Bethel.

{¶ 132} Venireman Ford said on voir dire: "I believe in capital punishment, I definitely believe that there are circumstances and factors that must be weighed out and I definitely fall in the middle" between an automatic death sentence and an automatic rejection of death. He said that if life were the appropriate sentence, he could sign a life verdict. When asked whether he would be "predisposed to the death penalty if he found that the defendant did purposely kill two people," he said, "Yes." However, he added, "I [would] totally try to do my best to clearly accept all the evidence and factors that are presented," and "I would definitely try my very best to be open-minded about the process."

{¶ 133} Based on the totality of Ford's voir dire, the trial court could properly conclude that Ford understood the importance of considering all the evidence and the relevant factors and that he would not automatically vote for death. Thus, substantial testimony supports the trial court's decision not to exclude him for cause.

{¶ 134} As for venireman Collier, Bethel was not prejudiced by the denial of his challenge to Collier. Although Bethel's challenge for cause was denied, Collier did not sit on the jury, and Bethel was not forced to use a peremptory challenge to eliminate him. See *State v. Eaton* (1969), 19 Ohio St.2d 145, 48 O.O.2d 188, 249 N.E.2d 897, paragraph one of the syllabus.

{¶ 135} No reversible error attaches to the trial court's rulings on the defendant's challenges for cause, which were raised in Bethel's 15th proposition of law. That proposition is therefore overruled.

## V. *Lesser Included Offense*

{¶ 136} In his 14th proposition of law, Bethel contends that the trial court should have granted his request for an instruction on the lesser included offense of murder. "Murder (R.C. 2903.02) is a lesser included offense of aggravated murder (R.C. 2903.01[A] ). * * * The sole difference is that prior calculation and design is absent from murder." *State v. Monroe,* 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 36. Bethel claims that the evidence reasonably supports a finding that the killings were purposeful, and thus constituted murder, but were not committed with prior calculation and design.

{¶ 137} However, Bethel's defense was alibi; he and his mother testified that he was at his mother's house between 10:00 and 11:00 p.m., June 25, 1996 (i.e., at the time Ron Bass heard gunshots). Ordinarily, when a defendant presents a complete defense to the substantive elements of the crime, such as an alibi, an instruction on a lesser included offense is improper. See, e.g., *State v. Strodes* (1976), 48 Ohio St.2d 113, 117, 2 O.O.3d 271, 357 N.E.2d 375.

{¶ 138} In such cases, a defendant is entitled to a lesser-included-offense instruction "only if, based on the evidence adduced by the state, the trier of fact can find for the defendant * * * on some element of the greater offense which is not required to prove the commission of the lesser offense and for the state on the elements required to prove the commission of the lesser offense." *State v. Solomon* (1981), 66 Ohio St.2d 214, 20 O.O.3d 213, 421 N.E.2d 139, paragraph two of the syllabus. "[I]f due to some ambiguity in the state's version of the events involved in a case the jury could have a reasonable doubt regarding the presence of an element required to prove the greater but not the lesser offense, an instruction on the lesser included offense is ordinarily warranted." Id. at 221, 20 O.O.3d 213, 421 N.E.2d 139. Thus, Bethel was entitled to a murder instruction only if the state's evidence was ambiguous on the element of prior calculation and design, such that a trier of fact could reasonably have found that Bethel killed the victims purposefully but without prior calculation and design.

{¶ 139} Bethel cites a portion of the testimony of one of the state's witnesses, Theresa Cobb Campbell, in support of his argument. According to Campbell,

when Bethel confessed the murders to her, he told her that when he, Chavis, and the victims went to shoot guns, he "had a feeling to shoot" and that he shot the victims "because he felt like it." Bethel contends that these statements, construed in the light most favorable to him, negated the element of prior calculation and design and could have led a trier of fact to conclude that the shootings were murders rather than aggravated murders.

{¶ 140} The portion of Campbell's testimony cited by Bethel does not create an ambiguity in the state's case. In *Solomon*, "[t]he *sole evidence* of a scheme designed to implement the calculated decision to kill * * * was the passage of time" between two incidents. (Emphasis added.) 66 Ohio St.2d at 221, 20 O.O.3d 213, 421 N.E.2d 139. The court found that "[a]lthough such evidence might have provided the jury with a reasonable basis for finding prior calculation and design, it is ambiguous in nature and did not necessarily lead to that conclusion." Id.

{¶ 141} Here, Campbell's testimony was far from being the sole evidence of Bethel's prior calculation and design. The fact that each witness does not provide testimony conclusively proving every element of a crime does not mean that a defendant is entitled to instructions on every lesser included offense. The whole of the state's case should be considered in determining whether an instruction on a lesser included offense should reasonably be given. *State v. Goodwin* (1999), 84 Ohio St.3d 331, 345, 703 N.E.2d 1251.

{¶ 142} Campbell's testimony actually supports the conclusion that Bethel planned the murders. He took the victims to a secluded spot. He shot them both in quick succession from close range. He then reloaded his gun and shot some more. He expressed to Campbell no regret or confusion as to his motivation.

{¶ 143} Even when considering Campbell's testimony in a light most favorable to Bethel, we conclude that under all the evidence presented, no reasonable trier of fact could have found that Bethel killed the victims purposefully but without prior calculation and design. Hence, Bethel was not entitled to a lesser-included-offense instruction on murder. Bethel's 14th proposition is overruled.

## VI. *Penalty-Phase Issues*

### A. *Ashworth* Issue

{¶ 144} In his sixth proposition of law, Bethel contends that the trial court erred by allowing Bethel to waive the presentation of mitigation evidence without inquiring into the knowing and voluntary character of Bethel's decision. See, generally, *State v. Ashworth* (1999), 85 Ohio St.3d 56, 706 N.E.2d 1231, paragraph one of the syllabus.

{¶ 145} In the penalty phase, Bethel made a brief unsworn statement in which he maintained his innocence. He expressed sympathy for the families of Reyn-

olds and Hawks. He told the jury that he had made efforts to change and was not the same person he had been at age 18. He pointed out that at the time of his arrest, he had been working and leading "basically a normal life." Defense counsel then presented the testimony of Joseph S. Burke Jr., the manager of a Subway restaurant where Bethel had worked. Burke testified that Bethel was a good worker who had begun as a crew member and was promoted within three or four months to assistant manager.

{¶ 146} After both parties rested in the penalty phase, defense counsel explained to the judge that the evidence presented was "all that [Bethel] would let us put on." Counsel informed the court that they had performed an investigation and had prepared a mitigation case. They had planned to present several witnesses: Bethel's mother, a teacher, social workers, and a guard at a juvenile facility. Counsel had also obtained reports from Children Services and the Hannah Neil House pertaining to Bethel's childhood. They were prepared to show that parental abandonment and neglect had denied Bethel guidance and discipline, but that Bethel had behaved unusually well in juvenile detention and had qualified for early release.

{¶ 147} Because Bethel would not allow his counsel to put on the case they had prepared, counsel consulted Jeffrey Smalldon, Ph.D., a psychologist, who concluded that Bethel was competent to waive mitigation.

{¶ 148} In *State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, at paragraph one of the syllabus, we held: "In a capital case, when a defendant wishes to waive the presentation of *all* mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary." (Emphasis sic.) In *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 74, we explained: "Given our emphasis in *Ashworth* on the word 'all,' it is clear that we intended to require an inquiry of a defendant only in those situations where the defendant chooses to present no mitigating evidence whatsoever."

{¶ 149} In this case, Bethel did not waive the presentation of *all* mitigating evidence. He presented mitigating evidence to the jury: his unsworn statement and the testimony of his former supervisor. Therefore, no *Ashworth* inquiry was required. Bethel's sixth proposition is overruled.

## B. Instructions

{¶ 150} In his 12th proposition of law, Bethel contends that the trial court's penalty-phase instructions were inadequate and improper.

{¶ 151} The trial court admitted all the guilt-phase evidence in the penalty phase. The court instructed the jury to "consider all of the evidence, the arguments of counsel, and all the other information and reports which are

relevant to the aggravating circumstances and mitigating factors." The court further instructed that "evidence" included "all of the testimony and exhibits produced at the first trial [i.e., the guilt phase] which is relevant to the aggravating circumstances and or the mitigating factors." However, by agreement of the prosecutor, none of the exhibits from the guilt-phase proceedings were ultimately provided to the jurors in their deliberations.

{¶ 152} Citing *State v. Getsy* (1998), 84 Ohio St.3d 180, 702 N.E.2d 866, Bethel contends that the trial court had the responsibility to determine what evidence was relevant rather than leaving that determination to the jury. However, the trial court in its instructions did not specifically leave it to the jury to determine what evidence was relevant, as the trial court did in *Getsy*. The trial court in *Getsy* instructed the jury to consider " 'all the evidence, including exhibits presented in the first phase of this trial which you deem to be relevant.' " (Emphasis deleted.) *Getsy*, 84 Ohio St.3d at 201, 702 N.E.2d 866. Here, the jury understood that they would see only the evidence that the *trial judge* deemed relevant.

{¶ 153} Further, in *Getsy*, "[t]he trial court denied the defense request to exclude certain items (i.e., shotgun, ballistic reports, and blood) from the penalty-phase deliberations. The defense renewed the request after the jury instructions were given and specifically objected to the instruction regarding the exhibits." Id. Here, Bethel failed to specifically object to the trial court's instruction at trial. Absent plain error, this issue is waived.

{¶ 154} Most guilt-phase evidence is relevant to the penalty phase. See *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542. The only guilt-phase evidence Bethel sought to have removed from the consideration of the jurors in the penalty phase were the photographs. Those exhibits were not provided to the jury during their penalty-phase deliberations. Hence, Bethel fails to demonstrate plain error.

{¶ 155} Bethel also complains that the jury was not instructed to "recommend the appropriate sentence as though your recommendation will, in fact, be carried out." See *State v. Mills* (1992), 62 Ohio St.3d 357, 375, 582 N.E.2d 972 (commending such an instruction as clear and accurate). Again, Bethel never proposed such an instruction at trial, nor did he object to the trial court's failure to give it. Absent plain error, this issue is waived.

{¶ 156} No plain error exists here. Although we commended the trial court in *Mills* for giving the above instruction, we did not require that it be given. Moreover, the instructions that were actually given at trial did not misstate the jury's role in any way. See *State v. Rogers* (1986), 28 Ohio St.3d 427, 429–431, 28 OBR 480, 504 N.E.2d 52. The trial court instructed the jury as follows: "You are not to construe the use of that word [recommend] to in any way diminish your

sense of responsibility in this matter." We approved such an instruction in *State v. Robb* (2000), 88 Ohio St.3d 59, 84, 723 N.E.2d 1019. Thus, there was no "obvious" error. *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240.

{¶ 157} Since Bethel put on little evidence in mitigation, neither is it clear that giving the *Mills* instruction would have brought about a different outcome. Bethel's 12th proposition is overruled.

## VII. *Ineffective Assistance*

{¶ 158} In his fourth proposition of law, Bethel claims that he received ineffective assistance of counsel both before and at his trial.

{¶ 159} In order to prevail on a claim of ineffective assistance of counsel, Bethel must show (1) deficient performance, i.e., performance falling below an objective standard of reasonable representation, and (2) resulting prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. See *Strickland v. Washington* (1984), 466 U.S. 668, 687–688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Williams v. Taylor* (2000), 529 U.S. 362, 390–391, 120 S.Ct. 1495, 146 L.Ed.2d 389; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus. Bethel alleges that his original counsel, Ronald Janes and Joseph Edwards, rendered ineffective assistance before trial and that his trial counsel rendered ineffective assistance during trial.

### A. Alleged Errors by Janes and Edwards

{¶ 160} Bethel claims that Janes and Edwards never prepared to try his case. This lack of preparation was prejudicial, he claims, because it compelled him to make a proffer and enter a guilty plea in order to buy time and to avoid having to go to trial with unprepared counsel.

{¶ 161} According to Bethel, Janes actually admitted at the suppression hearing that as of August 30, 2001, the defense was not prepared for the upcoming trial. On cross-examination, Janes was asked: "Do you know if at the time of his plea agreement he [i.e., Bethel] was prepared—whether or not *he* was prepared for trial?" Janes replied: "No, I don't believe *he* was." (Emphasis added.)

{¶ 162} This exchange does not support Bethel's interpretation of Janes's testimony as a confession that the defense was inadequately prepared. Janes may well have meant only that Bethel himself was not *willing* to go to trial when a death sentence was a possibility.

{¶ 163} Bethel also cites his own guilt-phase testimony and that of private investigator Gary Phillips to support his claim that Janes and Edwards were unprepared. Phillips testified that three weeks before the scheduled start of the

trial, Janes contacted him "in somewhat of a panic mode" and asked for Phillips's assistance in investigating the case. Phillips admitted, however, that he did not know whether Janes and Edwards had sought a continuance of the scheduled trial date and said that it would have been "kind of rare" for Bethel's case to have gone to trial within a year of his indictment. Moreover, after reviewing evidence in the case, Phillips recommended to Bethel that he agree to the offered plea bargain.

{¶ 164} Bethel testified that his attorneys were unprepared, but he also testified that he never sought a continuance in the case. He had also testified that the plea agreement was "a good idea" and that his only problem with the plea agreement was that he would have to testify against Jeremy Chavis. Besides Janes, Edwards, and Phillips, Bethel's mother, Sanford Cohan, the attorney hired by Bethel's mother to monitor the case, and Jim Crites, Bethel's mitigation expert, all urged Bethel to accept the plea agreement.

{¶ 165} We reject Bethel's contention that Janes and Edwards were unprepared for trial and forced Bethel into a plea agreement. Bethel's claim that his attorneys would betray him in order to avoid trial is incredible and has no evidentiary support. All indications are that Janes and Edwards sought and recommended a plea agreement because they were working in Bethel's best interest.

{¶ 166} Bethel also contends that Janes and Edwards were ineffective because they "fail[ed] to adequately and completely explain [the] plea agreement" to him. Janes and Edwards testified at the suppression hearing that they did not specifically recall explaining Paragraph Six of the plea agreement (the "null and void" language) to Bethel. However, the trial court found that Bethel fully understood that his proffer could be used against him if he breached the agreement. Although Bethel claimed that he was misled by counsel and confused by the alleged conflict between Paragraphs One and Six, the trial court found that his suppression-hearing testimony lacked credibility, while the testimony of Janes and Edwards was credible.

{¶ 167} In sum, we lack a factual basis for finding that Janes and Edwards committed errors amounting to deficient performance. Thus, we reject Bethel's claims that Janes and Edwards provided ineffective assistance of counsel.

## B. Alleged Errors by Trial Counsel

{¶ 168} Bethel contends that his trial counsel were ineffective because they failed to obtain defense experts on false confessions, ballistics, forensics, and crime-scene reconstruction. We find that Bethel was not prejudiced by trial counsel's actions. In *State v. Madrigal* (2000), 87 Ohio St.3d 378, 721 N.E.2d 52, we rejected a similar claim that counsel should have obtained an expert on

eyewitness identification: "[R]esolving this issue in Madrigal's favor would be purely speculative. Nothing in the record indicates what kind of testimony an eyewitness identification expert could have provided. Establishing that would require proof outside the record * * *. Such a claim is not appropriately considered on a direct appeal." Id. at 390–391, 721 N.E.2d 52.

{¶ 169} Bethel contends that his counsel should have objected to evidence concerning his gang membership on the ground that it was irrelevant. We reject this claim because counsel had no valid basis to object to the evidence of Bethel's gang affiliation.

{¶ 170} A defendant's gang affiliation can be relevant and is admissible in cases " 'where the interrelationship between people is a central issue.' " *United States v. Gibbs* (C.A.6, 1999), 182 F.3d 408, 430, quoting *United States v. Thomas* (C.A.7, 1996), 86 F.3d 647, 652. See, also, *United States v. Sloan* (C.A.10, 1995), 65 F.3d 149, 150–151. Here, the evidence showed that Reynolds was killed by two members of the Crips gang because he was a witness to the criminal activity of a third member. The gang affiliation of Bethel, Jeremy Chavis, and Tyrone Green strengthens Bethel's motive to commit the shootings. See *People v. Miller* (1981), 101 Ill.App.3d 1029, 1034–1035, 57 Ill.Dec. 358, 428 N.E.2d 1038 (evidence implying gang membership admissible to show defendant's motive for becoming involved in dispute between defendant's associate and victim). The gang evidence thereby makes Bethel's guilt more likely than it would be without that evidence. Thus, it was relevant under Evid.R. 401. See *Sloan*, 65 F.3d at 151.

{¶ 171} Bethel also argues that the probative value of the gang-affiliation evidence was substantially outweighed by the risk of unfair prejudice. "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice * * *." Evid.R. 403(A). The trial court has broad discretion in determining whether unfair prejudice substantially outweighs probative value under Evid.R. 403(A). A reviewing court will not interfere absent a clear abuse of that discretion. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 40.

{¶ 172} Even had there been an objection, the trial court would not have committed a clear abuse of discretion by admitting the gang evidence. It is true, as Bethel argues, that evidence of gang membership creates some risk of unfair prejudice. See, e.g., *United States v. Jobson* (C.A.6, 1996), 102 F.3d 214, 219, fn. 4. On the other hand, the state's use of the evidence was restrained.

{¶ 173} The evidence regarding Bethel's gang membership consisted of Langbein's bare statement that Bethel was a member of the Crips and one photograph of Bethel flashing gang signs with his hands. Beyond the information that the Crips were a gang, the state introduced no evidence about the organization—for instance, about its general criminal propensities or about unrelated criminal

enterprises—that might have inflamed the jury. Nor did the state discuss the Crips in its opening or closing statements. In light of the relevance of Bethel's gang affiliation and the state's minimal use of that evidence, the danger of unfair prejudice did not substantially outweigh the probative value of the gang evidence.

{¶ 174} Bethel also argues that the gang evidence constituted improper "other acts" evidence. Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of *motive*, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Emphasis added.) The state, however, made no attempt to use the gang evidence as proof of Bethel's character. Moreover, as already noted, the evidence was probative of Bethel's motive. Accordingly, its admission did not violate Evid.R. 404(B).

{¶ 175} Finally, Bethel argues that the gang evidence violated the First Amendment. Citing *Dawson v. Delaware* (1992), 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309, Bethel contends that gang membership is protected by the First Amendment right of association and that the state could not introduce evidence of his gang membership without showing its relevance.

{¶ 176} Bethel's First Amendment claim lacks merit. *Dawson* held that the First Amendment precludes a state "from employing evidence of a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried." 503 U.S. at 168, 112 S.Ct. 1093, 117 L.Ed.2d 309. At Dawson's penalty phase, the jury was told that he belonged to the Aryan Brotherhood, which was described as "a white racist prison gang"; the gang's racism was not relevant to the case, and the jury was told nothing about the gang that *was* relevant. Moreover, the gang's beliefs were of a sort that the jury was apt to find "morally reprehensible." Id. at 167, 112 S.Ct. 1093, 117 L.Ed.2d 309.

{¶ 177} *Dawson*, then, is a case about using a defendant's irrelevant abstract beliefs to prejudice his sentencing proceeding. In this case, the state introduced no evidence concerning any abstract beliefs held by the Crips. Thus, evidence of Crips membership had no tendency to associate Bethel with beliefs that "the jury would find * * * morally reprehensible." Moreover, unlike Dawson's gang membership, Bethel's membership was relevant to his criminal activity.

{¶ 178} Bethel next contends that his trial counsel provided ineffective assistance because they failed to object to Detective Kallay's testimony that Bethel had initially pleaded guilty to the aggravated murders of Reynolds and Hawks. The record indicates that counsel had a reasonable strategic purpose for not objecting to this testimony. At trial, Bethel repudiated his proffer and claimed that his admission of guilt was a lie. It was therefore crucial for the defense to explain *why* Bethel had lied in his proffer. Accordingly, Bethel's trial counsel

undertook to set forth in detail the course of the plea negotiations that resulted in the proffer. It was the defense that first raised the subject of the plea agreement in its opening statement ("As a last resort, this young man capitulated and he agreed to enter into a plea bargain") and returned to this topic in closing argument. The defense also elicited Bethel's testimony that Janes and Edwards had pressured him to plead guilty because they were unprepared for trial. Having adopted this strategy and having already informed the jury that Bethel had entered into a plea bargain with the state, the defense had no reason to object to Kallay's brief testimony concerning Bethel's guilty plea.

{¶ 179} Bethel argues that his trial counsel should have introduced Traci Queen's prior inconsistent statement under Evid.R. 613(B). On cross-examination, Queen testified that she had never heard Reynolds and Joey Northrup argue, nor had she seen them fight. Defense counsel then asked Queen whether she had told defense investigator Martha Phillips that she had seen Reynolds and Northrup fighting about two weeks before the murders. She again denied having seen them fight. Counsel asked Queen whether she had told Phillips that Reynolds had thrown a handful of rocks at Northrup's window. Queen denied telling Phillips that.

{¶ 180} Under Evid.R. 613(B), a party may introduce extrinsic evidence of a witness's prior inconsistent statement to impeach the witness's credibility. Bethel argues that counsel should have called Martha Phillips to testify to Queen's prior inconsistent statement under Evid.R. 613(B), because Queen's prior statement would have corroborated a defense theory that Northrup may have been the real killer.

{¶ 181} Bethel's argument is flawed. First, his claim that Phillips would have testified that Queen made the statements in question is pure speculation, unsupported by anything in the record.

{¶ 182} Second, Bethel's argument disregards the difference between using a prior statement *to impeach its maker* under Evid.R. 613(B) and using it as *substantive evidence*—i.e., to prove the truth of the matter asserted in the statement—under Evid.R. 801(D)(1)(a). Bethel cites Evid.R. 613(B), which permits extrinsic evidence of a prior inconsistent statement only to impeach. But he argues that his counsel should have used the statement *substantively* to prove that Northrup and Reynolds had fought.

{¶ 183} Substantive use of a prior inconsistent statement is covered by Evid.R. 801(D)(1)(a). Under that rule, there are limited circumstances in which a prior inconsistent statement is not hearsay and may be used as substantive evidence—i.e., to prove the truth of the matter asserted in the statement. A prior inconsistent statement is not hearsay if it "was given under oath subject to cross-examination by the party against whom the statement is offered and subject to

the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." Evid.R. 801(D)(1)(a). See *State v. Julian* (1998), 129 Ohio App.3d 828, 836, 719 N.E.2d 96, fn. 12.

{¶ 184} Queen's alleged prior inconsistent statements to Phillips meet *none* of the criteria for substantive admissibility under Evid.R. 801(D)(1)(a). They were neither under oath, subject to cross-examination, nor given at a proceeding or deposition. Hence, her statements could not have been used substantively to show that Northrup and Reynolds had fought. See *Julian*, supra. Defense counsel did not perform deficiently by failing to attempt a maneuver that the Rules of Evidence preclude.

{¶ 185} Moreover, while the defense *could* have introduced the prior statements under Evid.R. 613(B) simply to impeach Queen, failing to do so did not constitute deficient performance, nor was it prejudicial. Defense counsel impeached Queen's testimony by other means—Queen admitted on cross-examination that she had been convicted of a misdemeanor involving check forgery. Further, as Bethel concedes, Queen's credibility was not critical to the state's case, which rested principally on Bethel's having admitted three different times to committing the murders.

{¶ 186} Bethel also claims that his trial counsel's assistance was ineffective because they failed to object to the prosecutor's alleged vouching for the credibility of Traci Queen during closing argument. However, no vouching took place, and no valid objection could have been made by Bethel's counsel to the prosecutor's remark.

{¶ 187} Bethel claims that his trial counsel should have objected to allegedly improper jury instructions. We held that the jury instructions were proper, and thus no valid objection could have been made to them.

{¶ 188} Finally, Bethel claims ineffective assistance because trial counsel failed, when making their arguments to the jury in the penalty phase, to utilize all the available mitigating evidence. He contends that trial counsel should have cited as mitigating factors (1) the state's willingness to offer a plea bargain, (2) Jeremy Chavis's life sentence, and (3) Bethel's cooperation with law enforcement.

{¶ 189} Bethel contends that the state's willingness to offer him a plea bargain was "the single most mitigating factor" in this case and that trial counsel should have argued that point to the jury. But we have held that the state's offer of a plea bargain is not a mitigating factor at all. *State v. Webb*, 70 Ohio St.3d at 336, 638 N.E.2d 1023. A plea offer does not constitute a concession by the state that death is not the appropriate penalty for a given offense. Because a plea offer is not a mitigating factor, defense counsel did not perform deficiently by failing to argue that it was.

{¶ 190} In 2001, Jeremy Chavis was convicted of the aggravated murders of Reynolds and Hawks and was sentenced to 30 years to life in prison, plus three years for a firearm specification. See *State v. Chavis,* Franklin App. Nos. 01AP–1456 and 01AP–1466, 2003-Ohio-512, 2003 WL 231265, ¶ 17 (affirming conviction). Bethel argues that Chavis's life sentence was a mitigating factor that counsel should have presented in the penalty phase. However, since Chavis was not yet 18 years old at the time of the murders, he was not even eligible for the death penalty. R.C. 2929.02(A). Bethel's counsel could not have credibly attempted to essentially use the age of Bethel's accomplice as mitigation. Further, we have held that a codefendant's life sentence is not a mitigating factor. *State v. Berry* (1995), 72 Ohio St.3d 354, 366, 650 N.E.2d 433.

{¶ 191} Bethel also argues that his trial counsel should have presented as a mitigating factor the fact that he gave a proffer confessing to the murders. A defendant's confession and cooperation with law enforcement are mitigating factors. *State v. Stallings* (2000), 89 Ohio St.3d 280, 300, 731 N.E.2d 159; *State v. Bays* (1999), 87 Ohio St.3d 15, 34, 716 N.E.2d 1126.

{¶ 192} However, defense counsel could have reasonably thought it inadvisable to present "cooperation with law enforcement" as a mitigating factor. First, Bethel's "cooperation" says little about his character, because it was obtained only as the result of a plea bargain. Cf. *Ashworth,* 85 Ohio St.3d at 72, 706 N.E.2d 1231 (willingness to plead guilty without offer of leniency indicates remorse). Second, Bethel claimed at trial that his proffer was involuntary. Finally, given Bethel's adamant refusal to testify against Chavis, a claim of "cooperation" would have rung hollow.

{¶ 193} Bethel's claims of ineffective assistance of counsel lack merit. We overrule his fourth proposition of law.

## VIII. *Prosecutorial Misconduct*

{¶ 194} In his 20th proposition of law, Bethel claims prosecutorial misconduct. Bethel contends that the prosecutor improperly vouched for Traci Queen's credibility when he said: "And Traci Queen, there is absolutely no reason that the defense can come up with, that I can conceive, that she would come in here and lie."

{¶ 195} Bethel failed to object to this statement at trial, thereby waiving any objection. The prosecutor's comment did not amount to plain error. He did not vouch for Queen's credibility; he merely pointed out that the defense had not cited any reason why she would lie. Moreover, Queen was not a crucial witness.

{¶ 196} Bethel also contends that the introduction of gang evidence by the prosecution was misconduct. This claim lacks merit, as the evidence was not

objected to and was admissible. (See discussion of fourth proposition of law.) Bethel's 20th proposition of law is overruled.

## IX. *Cumulative Error*

{¶ 197} In his 11th proposition, Bethel claims that the cumulative effect of the alleged errors denied him a fair trial. We have recognized the doctrine of cumulative error. See *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 48. However, it is not enough simply to intone the phrase "cumulative error." "As [Bethel] offers no further analysis, this proposition lacks substance * * *." *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 103. Bethel fails to show that the alleged errors denied him a fair trial. This proposition is overruled.

## X. *Settled Issue*

{¶ 198} In his 13th proposition, Bethel contends that Ohio's death-penalty statutes are unconstitutional. We summarily overrule this proposition. See *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568.

## XI. *Independent Sentence Review*

{¶ 199} Under R.C. 2929.05(A), we must independently review the death sentence on each count of aggravated murder. As to each count, we must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence is proportionate to those affirmed in similar cases.

{¶ 200} **Aggravating circumstances.** The jury found Bethel guilty of two aggravating circumstances as to each murder. The aggravating circumstances of Reynolds's murder were (1) that the aggravated murder was part of a course of conduct involving two or more intentional killings, R.C. 2929.04(A)(5), and (2) that the victim was a witness to another offense and was purposely killed to prevent his testimony, R.C. 2929.04(A)(8). The aggravating circumstances of Hawks's murder were (1) that the murder was part of a course of conduct involving two or more intentional killings, R.C. 2929.04(A)(5), and (2) that the defendant committed the murder to escape detection, apprehension, trial, or punishment for another offense, R.C. 2929.04(A)(3).

{¶ 201} The evidence supports each of these aggravating circumstances. Bethel's simultaneous killing of two victims in a single incident clearly established the course-of-conduct specifications. See, generally, *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239. Moreover, the evidence shows that Reynolds was purposely killed to prevent him from testifying in Tyrone Green's aggravated murder trial, thus establishing the specification under R.C.

2929.04(A)(8). Near the end of May 1996, Green learned that Reynolds had told Pryor that he had seen Green commit murder; at some point, Jeremy Chavis came into possession of Green's discovery materials; Bethel and Langbein had discussed that they were going to "take steps to get rid of" Reynolds and Pryor; in mid-June, Bethel and Chavis's brother bought guns; before June had ended, Bethel and Chavis killed Reynolds.

{¶ 202} Finally, the evidence supports the specification under R.C. 2929.04(A)(3) attached to Hawks's murder. Hawks was the sole nonparticipating witness to the murder of Reynolds. That supports a finding that Bethel and Jeremy Chavis killed her to hide the commission of Reynolds's murder. *State v. Jester* (1987), 32 Ohio St.3d 147, 149, 512 N.E.2d 962.

{¶ 203} **Mitigating factors.** Bethel was born on March 23, 1978. Thus, he was only a few months over 18 when he committed these murders. Under R.C. 2929.04(B)(4), the youth of the offender is a mitigating factor. "This factor is entitled to some weight, especially since eighteen is the minimum age for death penalty eligibility." *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 98. See, also, *State v. Hill* (1992), 64 Ohio St.3d 313, 335, 595 N.E.2d 884. However, there is no evidence to support any of the other statutory mitigating factors. Nor do the nature and circumstances of these crimes offer anything in mitigation. To the contrary, this was a coldly calculated double murder.

{¶ 204} Bethel's history and background reflect some minimal mitigating factors, although his character does not. The record shows that Bethel's parents separated when he was about nine and divorced when he was 11. We give this factor little weight.

{¶ 205} In the penalty phase, Bethel made a brief unsworn statement in which he continued to claim innocence. He expressed sympathy for the families of Reynolds and Hawks. He told the jury that he had made efforts to change and was not the same person he had been at age 18. He pointed out that at the time of his arrest, he was working and leading "basically a normal life."

{¶ 206} The record shows that Bethel was employed at a BP gas station at the time of the murders. Bethel also worked for about a year at a Subway restaurant in Columbus. Bethel testified in the guilt phase that he had worked 40 to 50 hours a week at the BP station and 60 hours a week at the Subway. In the interim, he had held a variety of other jobs, often holding two jobs at a time and putting in 70 to 80 hours a week.

{¶ 207} In late 1999 or early 2000, Joseph S. Burke Jr. hired Bethel to work at the Subway restaurant that Burke managed. Three or four months later, Burke promoted him to assistant manager because Bethel was a good worker and "worked the hours an assistant manager would work."

{¶ 208} Bethel's work record is entitled to slight weight. At the very time that Bethel was employed at BP, he murdered two people. However, in the year prior to his arrest, Bethel appeared to be a reliable worker.

{¶ 209} In the penalty phase, Bethel introduced evidence about his disciplinary record during his pretrial incarceration in the Franklin County Jail. See, generally, *Skipper v. South Carolina* (1986), 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1; *State v. Smith* (1997), 80 Ohio St.3d 89, 121–122, 684 N.E.2d 668. Jail records show that between November 6, 2000, and July 7, 2003, Bethel was given two "disciplinary write-ups." On April 28, 2001, he received a written warning for manufacturing an item without permission and possessing contraband. On September 27, 2002, he received a five-day "disciplinary lockdown" for smoking in a prohibited area and possessing contraband.

{¶ 210} Bethel argued at trial that this was a good disciplinary record. According to Bethel, his commission of only two nonviolent, relatively minor infractions during two years and nine months in jail indicated a growing maturity and ability to follow rules. While this factor is entitled to weight, we do not regard this as an impressive record and give it only "slight weight." *Smith*, 80 Ohio St.3d at 121–122, 684 N.E.2d 668. See, also, *State v. Wiles* (1991), 59 Ohio St.3d 71, 95, 571 N.E.2d 97.

{¶ 211} The aggravating circumstances of multiple murder and witness murder outweigh the totality of Bethel's mitigating factors beyond a reasonable doubt. Thus, his death sentence for Reynolds's murder is appropriate. The aggravating circumstances of multiple murder and murder to escape detection, apprehension, trial, or punishment for another offense also outweigh the mitigating circumstances beyond a reasonable doubt. Thus, his death sentence for Hawks's murder is appropriate as well.

{¶ 212} Finally, the death sentences here are proportionate to other sentences that we have approved. We have approved death sentences in cases presenting a course of conduct involving two murders. See *State v. Awkal* (1996), 76 Ohio St.3d 324, 667 N.E.2d 960; *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439; *State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071. Moreover, we "have approved death sentences in cases where the witness-murder specification was present alone or in combination with one other specification, even when substantial mitigation existed." *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 101. See *State v. Coleman* (1999), 85 Ohio St.3d 129, 707 N.E.2d 476; *State v. Smith* (2000), 87 Ohio St.3d 424, 721 N.E.2d 93. Finally, we upheld the death sentence in *State v. White* (1999), 85 Ohio St.3d 433, 709 N.E.2d 140, which combined the same aggravating circumstances involved in Hawks's murder: course of conduct and murder to escape detection, apprehension, trial, or punishment for another offense. Thus, we hold that

Bethel's death sentences are not disproportionate to death sentences approved in similar cases.

{¶ 213} We affirm Bethel's convictions and sentences of death.

Judgment affirmed.

MOYER, C.J., RESNICK, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

———

Ron O'Brien, Franklin County Prosecuting Attorney, and Steven L. Taylor and Richard Termuhlen II, Assistant Prosecuting Attorneys, for appellee.

Ravert J. Clark, for appellant.