[Cite as *State v. Dixson*, 2014-Ohio-4539.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

**STATE OF OHIO,**

    **PLAINTIFF-APPELLEE,**               **CASE NO. 13-13-53**

    **v.**

**CALVIN B. DIXSON,**                    **O P I N I O N**

    **DEFENDANT-APPELLANT.**

**Appeal from Seneca County Common Pleas Court**
**Trial Court No. 13 CR 0117**

**Judgment Affirmed**

**Date of Decision:   October 14, 2014**

**APPEARANCES:**

    *Jonathan G. Stotzer* **for Appellant**

    *Derek W. DeVine and Stephanie Reed* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Calvin B. Dixson ("Dixson") brings this appeal from the judgment of the Court of Common Pleas of Seneca County finding him guilty of aggravated murder and attempted aggravated murder. For the reasons set forth below, the judgment is affirmed.

{¶2} On July 28, 2013, Tyeesha Ferguson ("Ferguson"), Lisa Stowers ("Lisa"), and Danielle Stowers ("Danielle") were sitting in a car in front of a house at 245 Bannister Street in Fostoria. The house belonged to Ferguson's great-grandmother, who was dying. Ferguson lived there as well. Ferguson saw Dixson, who was her ex-boyfriend, approaching the car and told the others to lock the car. Danielle then got out of the car and went up to the house, leaving Ferguson and Lisa in the car. Dixson went up to the car, pulled out a gun and shot Lisa approximately nine times. Dixson then turned the gun toward Ferguson and fired it at her numerous times. Lisa was pronounced dead at the scene, but Ferguson was taken to the hospital and survived her injuries.

*Procedural History*

{¶3} On August 1, 2013, the Seneca County Grand Jury indicted Dixson on two counts: 1) Aggravated Murder in violation of R.C. 2903.01(A) with a firearm specification and 2) Attempted Aggravated Murder in violation of R.C. 2903.01(A) and 2923.02 with a firearm specification. Doc. 1. Dixson was

arraigned on August 13, 2013, and entered pleas of not guilty to the counts. Doc. 12. A jury trial was held from October 21-24, 2013. Doc. 55. The jury returned verdicts of guilty as to both counts and both firearm specifications. Doc. 53-54. On October 25, 2013, Dixson was sentenced to a prison term of life without the possibility of parole as to Count One and a prison term of ten years for Count Two. Doc. 57. Additionally, Dixson was ordered to serve three years for each of the firearm specifications. *Id.* All of the sentences were ordered to be served consecutively for a total sentence of life imprisonment without parole plus sixteen years. *Id.*

*Trial Testimony*

{¶4} The State presented the testimony of fifteen witnesses and Dixson presented no evidence. The pertinent testimony was as follows.[1] The first witness for the State was Officer Corey Bryan ("Bryan") of the Fostoria Police Department. Tr. 171. On July 28, 2013, Bryan received a dispatch sending him to the 200 block of Bannister Street. Tr. 172-73. As he was driving, he observed a hysterical woman a block away who told him she had left the house on Bannister. Tr. 174. Bryan made sure she was not injured and proceeded to the scene to help secure it. Tr. 174. The ambulance was on the scene when he arrived. Tr. 175. Bryan assisted the EMT's in getting the victim from the rear of the vehicle onto

---

[1] Testimony of witnesses who merely testified to chain of custody or to the arrest of the defendant, but did not add any material evidence has been omitted from the summary of the trial testimony.

the stretcher. Tr. 175. While doing so, he observed gunshot wounds to Ferguson's abdomen. Tr. 177. He then observed Lisa sitting in the front seat of the vehicle. Tr. 176. Bryan also identified photos of the scene showing the injuries to Lisa while she was in the vehicle. Tr. 178-79.

{¶5} The second witness was Robin Palmer ("Palmer"), who lived next door to the scene. Tr. 183. The afternoon of July 28, 2013, Palmer was standing at her door waiting on her son to get home. Tr. 185. Palmer testified that she saw a black male walking across the field and up the driveway of the neighboring home. Tr. 186. She saw him walk up to the white car parked in the drive and then heard what "sounded like a brick of fire crackers going off." Tr. 186-87. She then yelled at him and he "kept on walking like it was nothing." Tr. 187. Palmer testified that she recognized him as a former boyfriend of Ferguson who had lived next door to her for a while. Tr. 187. Then Palmer identified Dixson in court as the person who walked up to the vehicle before she heard the shots. Tr. 188. According to Palmer, Dixson was wearing gray shorts, was clean cut and had a small goatee. Tr. 191.

{¶6} On cross-examination Palmer testified that the shooter wore his hair "close to the head." Tr. 204. She testified that the person she saw walking toward the car was walking normally and she thought he was going to visit the neighbor who was dying. Tr. 209. Palmer admitted that when Dixson went up by the trash

-4-

cans, she could not see him anymore, so she did not see the shooting. Tr. 212. When Palmer yelled at Dixson because she thought he had thrown firecrackers in the trashcan to scare Ferguson and she thought it was disrespectful since the grandmother was in the home dying from cancer. Tr. 218. She then walked over to the scene and saw the car and victims. Tr. 219. Palmer then called 9-1-1 for assistance. Tr. 219. Palmer admitted that when questioned by the police, she told them she did not recognize the shooter. Tr. 228.

{¶7} Eugene Ochs ("Ochs") testified that he lives approximately two blocks away from Bannister Street. Tr. 235. After mowing his lawn, he saw a dark truck pull down the street and park in front of a house next to Harmon Park. Tr. 236. Ochs saw a black man with a beard driving the truck. Tr. 236. The driver then got out of the truck and started walking south between the houses. Tr. 238. A short time later, he saw the same man walk back, get in the truck and leave. Tr. 239. Soon afterward, Ochs heard the sounds of someone screaming in distress. Tr. 239. Ochs testified that he heard the screams at about the same time he saw the man get back in the truck. Tr. 240. On cross-examination, Ochs testified that it would take three to five minutes to walk from 4th Street, where Ochs lived, to Bannister Street. Tr. 242.

{¶8} The fourth witness for the State was Jeffrey Phillips ("Phillips"). On the day of the shooting, Phillips lived on West Lytle Street, which is one block

away from Bannister Street to the north. Tr. 246, State's Ex. 33. While in his house on July 28, 2013, he heard several rapid gunshots. Tr. 246. Phillips then heard rustling between his home and the neighbor's home. Tr. 247. He looked out the window and saw somebody run by. Tr. 247. Phillips described the man he saw as stocky and wearing black and white clothing. Tr. 247. According to Phillips, the man he saw was a tan white male, an African American or Mexican. Tr. 249. Phillips testified that the man was jogging, not walking. Tr. 249. Both of the man's hands were in front of his abdomen. Tr. 250.

{¶9} The eighth witness for the State was Megan Anello ("Anello") who testified that she is a crime scene agent for the Bureau of Criminal Identification & Investigation ("BCII"). Tr. 281. Anello was called to process the scene on the day of the shooting. Tr. 283. When Anello arrived on the scene, there was a white two-door Grand Prix parked in the drive near the street. Tr. 283. The doors were open and the windows were both shattered. Tr. 283-84. There was a deceased woman in the front passenger seat who was covered with a sheet. Tr. 284. Based upon the glass inside of the car, the shots came from outside of the vehicle to the interior. Tr. 287. Anello testified that there were numerous cartridge casings at the scene. Tr. 288. Anello identified many of the pictures of the injuries to the victim and images of the bullets found in the vehicle. Tr. 290-95. Anello also testified that she observed a "marijuana blunt" in the rear seat of

the vehicle. Tr. 294. Nine shell casings were recovered from the scene. Tr. 299. All of the casings were "inscribed on the head stamp, which is the flat portion of the bullet, with Barnes Luger Plus P written on them." Tr. 299. The recovered bullets were consistent with a nine millimeter weapon. Tr. 303-304.

{¶10} Anello testified that she returned to Fostoria on July 31, 2013, to examine two vehicles believed to have been used by the suspect after the shooting. Tr. 304. The first vehicle she examined was a gray, 1992 "F-150 Ram" truck.[2] Tr. 305. The second was a red and gray, 1967 pull-along camper. Tr. 305. Inside the camper, Anello found a black and white striped sweatshirt. Tr. 307. A receipt for "Barnes Tack SPD Personal Ammunition" was found inside the truck. Tr. 307.

{¶11} Anello also testified that she attended the autopsy of Lisa and took photographs during it. Tr. 328-29. In addition, Anello collected the four bullets removed from Lisa during the autopsy. Tr. 332-33. The bullets collected were consistent with a nine millimeter bullet. Tr. 333. On cross-examination, Anello testified that other than the receipt for ammunition, they found no evidence in the truck or the camper related to a firearm. Tr. 334-35.

{¶12} The tenth witness for the State was Ferguson. Tr. 358. Ferguson testified that she moved to 245 Bannister Street in Fostoria to live with her great-grandmother in March of 2013. Tr. 360. According to Ferguson, she had known

---

[2] This court recognizes that F-150 trucks are Fords and Ram trucks are Dodge. However, this is the testimony given by the witness.

-7-

Dixson since July of 2008, and they had been boyfriend and girlfriend on and off until December of 2012. Tr. 359-60. In December of 2012, Ferguson obtained a restraining order against Dixson. Tr. 360. After the end of the relationship, Dixson continued to contact her by phone and impromptu visits. Tr. 360. After getting the restraining order, Dixson continued to harass Ferguson and threatened to kill her, her children, and other members of her family. Tr. 361. Ferguson did not report any of this contact to law enforcement despite having the restraining order. Tr. 362. Ferguson testified that Dixson had given her a cell phone and insisted that she contact him using that phone and that she respond to his calls. Tr. 362-63. She received the phone around the end of June, beginning of July. Tr. 365. Dixson would frequently text her on that phone and he was the only one who called her on that phone. Tr. 365.

{¶13} Ferguson also testified to the events of July 28, 2013. During the day, Dixson was calling Ferguson and sending her text messages. Tr. 380. Ferguson denied speaking with Dixson when he called as she was busy caring for her great-grandmother. Tr. 378-80. Later in the day, Ferguson was sitting in the drive in a car with her mother (Lisa) and her sister (Danielle). Tr. 380. The car was a white, two door Pontiac Grand Am and Ferguson was seated in the rear passenger seat. Tr. 381. Lisa was seated in the front passenger seat and Danielle was seated in the driver's seat. Tr. 381-82. Ferguson testified that she saw Dixson

walking toward the car from the empty field across the street. Tr. 382. Her reaction on seeing him was "Oh, s**t. Here comes Calvin." Tr. 383. She then told Danielle to go lock the door to the house, and Danielle left the car to do so. Tr. 383. Ferguson and Lisa stayed in the car and locked the doors. Tr. 384. Ferguson testified that she heard Dixson ask Danielle where she was. Tr. 384. Dixson then came over to the car and asked Lisa where Ferguson was. Tr. 384. Lisa then shrugged her shoulders. Tr. 385. Ferguson testified that Dixson then said "you thought I was playing", lifted his shirt, brought out a pistol, and began firing into the vehicle. Tr. 385. After Dixson fired numerous times at Lisa, he turned the gun on Ferguson and started shooting her. Tr. 386. Ferguson was shot seven times. Tr. 387. Dixson then turned and walked away calmly. Tr. 387. On cross-examination, Ferguson admitted telling officers that the shooter was wearing a mustard or checkered shirt. Tr. 393.

{¶14} Donna Schwesinger ("Schwesinger") testified that she is a forensic scientist for BCII in the trace evidence department. Tr. 418. Schwesinger was responsible for testing Dixson's shorts for gunshot primer residue. Tr. 420. The tests indicated gunshot primer residue was on the shorts. Tr. 421. On cross-examination Schwesinger testified that no glass particles were found on the clothing submitted for testing. Tr. 424. She also admitted that people who work in the construction field with certain tools could possibly have gunshot primer

residue on them from using those tools. Tr. 430-31. Although the test determines if there is gunshot primer residue, it cannot determine the source. Tr. 435.

{¶15} Brent Paxton ("Paxton") testified that he was employed at Gander Mountain, a firearms supercenter, located in Holland, Ohio. Tr. 450. Paxton testified that on July 27, 2013, he sold nine millimeter ammunition to a customer. Tr. 453. Paxton also identified State's Exhibit 19 as the surveillance video recording of the sale. Tr. 451-52.

{¶16} Danielle testified next for the State. Danielle testified that on July 28, 2013, she was sitting in the car with Lisa, her mother, and Ferguson, her sister. Tr. 461. Danielle testified that she was in the driver's seat, Lisa was beside her in the passenger seat, and Ferguson was behind Lisa in the rear passenger seat. Tr. 464. When Danielle looked across the street, she saw a man walking towards the car. Tr. 465. Ferguson said "that's Calvin. Lock the door." Tr. 465. Danielle did not know whether to get out of the car, but did and went toward the house. Tr. 465. Danielle recognized the name as Ferguson's ex-boyfriend. Tr. 465. She testified that Ferguson was nervous when she saw Dixson. Tr. 465. When Danielle left the car, she locked the door and slammed it shut. Tr. 466. As Danielle approached the porch of the house, Dixson was in the street in front of the house. Tr. 466-67. As she approached the house, Dixson asked her if Ferguson was in the house. Tr. 468. The question was asked in a calm voice. Tr.

469. Danielle testified that she shook her head and walked up to the house. Tr. 470. Before she entered the house, she saw Dixson approach the car and ask if Ferguson was in the car. Tr. 470. Danielle testified that she turned around and heard Dixson say "so you thought I was playing." Tr. 470. She saw him reaching for something, so she ran into the house. Tr. 470. Danielle then heard gun shots and screamed for someone to call 9-1-1. Tr. 471. Danielle testified that she then ran out the back door and climbed the fence, ran through the backyards screaming. Tr. 471-72.

{¶17} Danielle described the man she saw as wearing a black hat, a black jacket with a white zipper, khaki shorts, and black shoes. Tr. 472-73. Although Danielle had not met Dixson prior to the shooting, she testified that she had gotten a good look at his face. Tr. 473. She was able to pick Dixson out of a photo array as the shooter later in the day. Tr. 474-75. Danielle also identified Dixson in the courtroom as the person she observed approaching the car. Tr. 477.

{¶18} On cross-examination, Danielle admitted that she, Lisa, and Ferguson had been smoking marijuana in the car prior to the shooting. Tr. 479. Danielle also testified that Ferguson had previously shown her a picture of Dixson where he was thinner than the one she saw in the photo array and had his hair in tight braids. Tr. 482.

{¶19} The thirteenth witness for the State was Detective Gabriel Wedge ("Wedge") of the Fostoria Police Department. Tr. 509. On July 28, 2013, Wedge was on vacation when he received a request to report for duty. Tr. 512. He arrived at the scene around 2:45 p.m. Tr. 513. Wedge testified that the initial 9-1-1 call was received at 1:26 p.m. Tr. 515. At the scene, family members gave Wedge the phone that Ferguson used for contact with Dixson. Tr. 516. While at the scene, Wedge did a walk around the area with K-9 Officer Don Dennis. Tr. 522.

> **[The dog] picked up a track in the entrance into 232 West Lytle on the north side of the road. The dog went into the fenced-in yard, which has a gate, but it was open. The dog went in, began going through the yard. Kind of made a circle and then went to the back fence where the alley is where the entrance is to the alley. They then followed the dog, he went between 279 and 281 West 4th Street onto the sidewalk. Went down in front of the residence of 271 West 4th Street, which is right next to Harmon Park. The dog went out into the roadway and it stopped. He tried to do a search, tried to pick up another track, but the dog just scented into the air, went back on the sidewalk, and went back the way he came.**

Tr. 522-23.

{¶20} Wedge was able to identify a yellow-green safety reflective vest as State's Exhibit 30 and testified that it was found in Dixson's truck. Tr. 565-66. Wedge then identified State's Exhibit 19 as the surveillance footage from Gander Mountain at the time and date on the receipt found in Dixson's truck. Tr. 586. The video showed two black men purchasing the ammunition, though they could

not be identified from the video. Tr. 571-72. One was wearing a white shirt with a ball cap and the other was wearing a ball cap, a dark shirt, khaki shorts, black shoes, and a reflective safety vest. Tr. 572-73. The safety vest resembled the one found in Dixson's truck. Tr. 572. The shorts resembled the ones taken from Dixson at the Seneca County Jail. Tr. 573, State's Ex. 17.

{¶21} Wedge also testified as to the procedure used to create the photo array shown to Danielle. Tr. 575. Wedge testified that Officer Daniel Dell found photos resembling Dixson and placed them in individual folders. Tr. 575-76. Wedge did know which picture was in which folder so that he would be an unbiased administrator. Tr. 576. When asked as to how the photo array was shown, Wedge testified as follows.

> **I sat down, explained what I was doing, and handed the photos over to [Danielle]. And explained to her if any of the people fit the description of the person you seen at the shooting, please stop and let me know.**

Tr. 576-77. The photos were each in a manila folder with a number on it. Tr. 577. Danielle picked out Number 4, and completed the paperwork to indicate the folder she chose. Tr. 577. Additionally, Danielle indicated that the shooter had lost some weight but she was "100% sure #4 is the shooter." State's Ex. 32.

{¶22} Wedge testified that he had reviewed the evidence in the case and based upon his experience and training, the injuries to Lisa and Ferguson were caused by shots from a handgun. Tr. 581. This was based upon the evidence and

the rounds removed from the victims. Tr. 581. Wedge also testified that the markings on the shell casings indicate the same size of bullet and the same manufacturer as the bullets listed on the receipt found in Dixson's truck as being purchased at Gander Mountain the day before the shooting. Tr. 585.

{¶23} On cross-examination, Wedge admitted that a nine millimeter round is a very common caliber for handguns across the United States. Tr. 594. Wedge also admitted that no firearm was recovered in this case. Tr. 596. Outside of the receipt indicating the purchase of ammunition, there was no evidence found that indicated that Dixson even owned a gun. Tr. 597. There are other caliber bullets that would be consistent with a nine millimeter as well. Tr. 598. Wedge also testified that when he first interviewed Palmer, she did not identify the shooter as Dixson, but instead said he was too far away to get a good look at his face. Tr. 604. Wedge also testified that Danielle had told him that she had seen Dixson's photo before the photo array. Tr. 605-606.

{¶24} The final witness for the State was Maneesha Pandey ("Pandey"). Pandey testified that she is a deputy coroner for the Lucas County Coroner's Office. Tr. 630-31. Pandey performed the autopsy on Lisa. Tr. 633. The cause of death for Lisa was multiple gunshot wounds. Tr. 634. Following the testimony of Pandey, the State rested. Tr. 645. Dixson then rested without presenting any evidence. Tr. 646.

{¶25} On appeal, Dixson raises twelve assignments of error.

### First Assignment of Error

**The evidence was insufficient for convictions on each counts [sic] and on each specification in the indictment.**

### Second Assignment of Error

**The verdicts are against the manifest weight of the evidence and must be reversed.**

### Third Assignment of Error

**The trial court erred failing to merge his sentences, and sentencing the defendant to consecutive sentences and consecutive additional mandatory weapons sentences, and to a maximum sentence on aggravated murder.**

### Fourth Assignment of Error

**The sentencing held by the trial court failed to meet the criteria of [R.C. 2929.11, 2929.12, 2953.08].**

### Fifth Assignment of Error

**The sentences of the trial court were excessive.**

### Sixth Assignment of Error

**The trial court erred in failing to give the jury instructions on lesser included offenses.**

### Seventh Assignment of Error

**The trial court erred in admitting autopsy photos.**

**Eighth Assignment of Error**

**The trial court erred in allowing text messages to be admitted into evidence.**

**Ninth Assignment of Error**

**The photo arrays used by the police to obtain identifications by Danielle Stowers and Robin Palmer were tainted and improperly suggestive in violation of U.S. Const. Amend. V and XIV, and Ohio Const. Art. 1, Sec. 10, and failed to comply with [R.C. 2933.83] and the use of photo array testimony and evidence during trial was plain error.**

**Tenth Assignment of Error**

**The prosecution committed prosecutorial misconduct.**

**Eleventh Assignment of Error**

**[Dixson] received ineffective assistance from defense counsel which impacted his case.**

**Twelfth Assignment of Error**

**The cumulative nature of all errors in the trial was so extensive that it was prejudicial to the [Dixson] and prevented him from having a fair trial.**

{¶26} In the interest of clarity, the assignments of error will be addressed out of order.

{¶27} The seventh and eighth assignments of error both address the admission of evidence. A trial court has broad discretion over the admission of evidence and its judgment shall not be reversed on appeal absent an abuse of that discretion. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d

1032. "For an abuse of discretion to have occurred, the trial court must have taken action that is unreasonable, arbitrary, or unconscionable." *Estate of Johnson v. Randall Smith, Inc.,* 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22.

{¶28} In the seventh assignment of error, Dixson claims that the trial court erred in admitting the autopsy photos. Initially, this court notes that trial counsel objected to the admission of the photos on the grounds that they were overly prejudicial. A review of the record and the testimony of the relevant witnesses regarding the photos indicates that the photos may not have been essential to establish the prosecution's case as multiple photos showing the body of Lisa in the vehicle and the gunshot wounds had already been seen by the jury. Additionally, there were multiple witnesses who testified that Lisa was killed by gunshot wounds. The cause of death was really not disputed by anyone at trial. The sole question litigated to the jury was who had pulled the trigger, not how Lisa had died. This fact is emphasized by the fact that Pandey, did not testify in depth to what occurred and did not even use the exhibits. The testimony by the deputy coroner was very short and merely consisted of cause of death. The photos were only shown during the testimony of Anello, who merely testified that she took the photos.

{¶29} However, the fact that the photos may not have been essential does not automatically make them overly prejudicial. The Ohio Supreme Court has

held that autopsy photos, that may not be needed to show cause of death, are not overly prejudicial as they are "all probative evidence of a purpose to cause death." *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 102. The Supreme Court reiterated that the prejudicial impact of autopsy photos does not outweigh their probative value. *Id.* at ¶ 103. *See also*, *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303 (holding that gruesome autopsy photos are probative of intent and are not overly prejudicial) and *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242 (holding that autopsy photos are admissible to show intent to kill). In light of these cases, this court holds that the autopsy photos were admissible to show the number of wounds which would indicate the intent of the shooter to kill Lisa. "[T]he state bears the burden of proof and it has no obligation to meet that burden in the least gruesome way." *Mammone* at ¶ 103. Thus, the trial court did not abuse its discretion in admitting the autopsy photos. The seventh assignment of error is overruled.

{¶30} Dixson argues in the eighth assignment of error that the trial court erred in admitting the text messages. The basis of this argument is that the messages were not authenticated because Ferguson did not individually identify each message as one she received from Dixson. The authentication of documents is controlled by Evidence Rule 901. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence

sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A).

{¶31} The testimony given by Ferguson is that Dixson gave her the Samsung cell phone and he was the only one who contacted her on it. Tr. 365. Other people contacted her on her Blackberry phone. Tr. 364-65. She also identified the initials C-A-P as a nickname for Dixson. Tr. 378. Ferguson also testified that Dixson was sending her text messages on July 28, 2013. Tr. 380. Although better evidence establishing the sending phone and receiving phone may have been available, this evidence is sufficient to establish that the incoming text messages labeled "Cap" to this specific phone were from Dixson. The trial court did not abuse its discretion in admitting the text messages allegedly from Dixson. The eighth assignment of error is overruled.

{¶32} In the ninth assignment of error, Dixson challenges the use of the photo arrays in the testimony of Palmer and Danielle. A review of the record in this case indicates that the photo array procedures used complied with the requirements of R.C. 2933.83. The statute requires the use of a blind administrator and a written record was completed. R.C. 2933.83 (B). The issues raised by Dixson deal with the credibility of the witnesses, not the procedure. Dixson claims that Palmer originally told the police she did not recognize the shooter, but later claims to be able to identify him in the photo array. This

discrepancy between Palmer's prior statements and her testimony at trial was raised during cross-examination of Palmer and through the testimony of Wedge.

{¶33} Likewise, Danielle testified that she picked Dixson out of the photo array. Danielle testified that she heard her sister identify the shooter as "Calvin" and that a few weeks earlier, she had seen a picture of Dixson. Danielle testified that the picture in the photo array did not look identical to the shooter, because he had lost weight. She also testified that he had less weight in the picture that Ferguson showed her than the one in the photo array. Again, this issue goes to the weight of the evidence, not to the admissibility. The credibility issue is one to be determined by the jury.

{¶34} Even if there was error in allowing the pretrial identifications through the photo arrays to be admitted during testimony, any error would be harmless. Ferguson testified that the person who came up to the car and shot Lisa and herself was Dixson. As his former girlfriend, she was very familiar with Dixson and was able to identify him by sight. Her identification of the shooter being Dixson was not challenged. Given this testimony, it is not likely that any issues with the photo array affected the outcome of the trial. Thus, any error would be harmless and the ninth assignment of error is overruled.

{¶35} In the first assignment of error, Dixson claims that the evidence was insufficient to support a conviction. A claim of sufficiency of the evidence raises

a due process question concerning whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶219, 954 N.E.2d 596 (citing *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541). "On review of the sufficiency of the evidence to support a criminal conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Hancock, supra* at ¶34 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560).

{¶36} In this case, Dixson was charged with aggravated murder, attempted aggravated murder, and two firearm specifications. To convict him of aggravated murder, the State had to prove that Dixson purposely and with prior plan caused the death of Lisa. R.C. 2903.01(A). To obtain a conviction under the firearm specification, the State had to prove that Dixson used a gun while committing the crime. The evidence was undisputed that Lisa was killed by multiple gunshot wounds. Ferguson testified that she saw Dixson walk up to the car, pull out a gun and shoot her mother multiple times. Ferguson also testified that her mother died in the car. Many witnesses testified that Lisa was killed in the car. A receipt showing the purchase of the ammunition was done the day before the shooting. A text message sent from Dixson to Ferguson on the morning of the shooting stated

"hunting season." Ex. 35. Ochs testified that a truck similar to Dixson's parked a couple blocks away and the driver got out walking toward the scene of the shooting. Palmer, Danielle, and Ferguson all testified that Dixson walked across the open lot and the street calmly. Danielle and Ferguson both testified that Dixson asked Danielle and Lisa where Ferguson was. When he did not get the answer he wanted, he pulled out the gun and started shooting. Viewing this evidence in a light most favorable to the State, the evidence is sufficient to prove that Dixson purposely killed Lisa by shooting her with a gun multiple times. The evidence is also sufficient to show that Dixson committed the offense after planning what he was going to do. Thus, the State presented sufficient evidence to indicate that Dixson committed aggravated murder and to support the firearm specification.

{¶37} Dixson was also charged with attempted murder with a firearm specification. The only difference in proof between the first charge and this charge is that Dixson's actions did not cause the death of the victim. As discussed above, there was testimony concerning the planning of the event and that Dixson was the shooter. Ferguson testified that after Dixson shot Lisa multiple times, he started firing the gun at her. She was struck with multiple bullets. Testimony was presented that she was transferred to the hospital and was severely injured. Wedge testified that the police were informed that Ferguson's condition was "touch and

go." Tr. 612. Viewing this evidence in a light most favorable to the State, a jury could reasonably conclude that Dixson had intentionally attempted to kill Ferguson, that he had planned to do so ahead of time, and that he used a firearm to do so. Thus, the State presented sufficient evidence that Dixson committed attempted murder with the use of a firearm. Having found sufficient evidence to support all charges, the first assignment of error is overruled.

{¶38} The second assignment of error claims that the convictions are against the manifest weight of the evidence. "A reviewing court may find a verdict to be against the manifest weight of the evidence even though legally sufficient evidence supports it." *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, ¶76, 781 N.E.2d 980.

> **A reviewing court considering a manifest-weight claim "review [s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses."** *State v. Martin* **(1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. The question for the reviewing court is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction." Id. See** *Thompkins,* **78 Ohio St.3d at 387, 678 N.E.2d 541.**

*Id*. at ¶77. Although the appellate court acts as a thirteenth juror, it still must give due deference to the findings made by the jury.

> **The fact-finder, being the jury, occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness' reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.**

*State v. Risch*, 3d Dist. Wyandot No. 16-10-14, 2011-Ohio-3633, ¶5 (quoting *State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (8th Dist. 1998)).

{¶39} A review of the record indicates that Ferguson, the surviving victim of the offenses, was able to provide a detailed narrative of what happened. She identified Dixson as the person who came up to the car, pulled out a gun, shot her mother, and then shot her. She was in a position to identify the shooter and very familiar with him so as to prevent mistaken identity. There was evidence presented that Dixson had previously threatened to kill Ferguson and her family. The evidence indicates that Dixson or a friend of his purchased ammunition of the same caliber and manufacturer that killed Lisa and almost killed Ferguson. Palmer and Danielle identified Dixson as the person who walked up to the car immediately before the shots were fired. Gunshot primer was found on Dixson's shorts. Given all of the evidence in the record, this court does not find that it weighs heavily against conviction. Therefore, the verdicts are not against the manifest weight of the evidence. The second assignment of error is overruled.

{¶40} In the sixth assignment of error, Dixson claims that the trial court erred by failing to instruct the jury on lesser included offenses. Dixson admits that his trial counsel did not request a lesser included offense instruction, thus our standard of review is plain error. *State v. Turks*, 3d Dist. Allen Nos. 1-10-02, 1-10-26, 2010-Ohio-5944.

> **To determine whether a criminal defendant was entitled to a jury instruction (charge) on a lesser included offense requires a two-step analysis. * * * First, the reviewing court must determine whether the one offense is, in fact, a lesser included offense of the other offense. An offense is a lesser included offense if: (1) one offense carries a greater penalty than the other; (2) some element of the greater offense is not required to prove commission of the lesser offense; and (3) the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed. * * * Second, the reviewing court must determine whether the trial court was obligated to give a jury instruction on the lesser included offense under the specific facts of the case. * * * "[A] charge on the lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser included offense." State v. Thomas (1988), 40 Ohio St.3d 213, 216, 533 N.E.2d 286.**

*Id*. at ¶18 (internal citations omitted).

{¶41} Dixson claims that the trial court should have instructed the jury on murder as well as aggravated murder. Murder is a lesser included offense of aggravated murder. *State v. Solomon*, 66 Ohio St.2d 214, 421 N.E.2d 139 (1981) and *State v. Rhodes*, 63 Ohio St.3d 613, 590 N.E.2d 261 (1992). The difference between the two is that a conviction for aggravated murder requires prior planning

and murder does not. R.C. 2903.01 and 2903.02. Thus, the first part of the analysis is satisfied. This leads to the second part, which is for this court to determine whether the trial court was obligated to give the instruction based upon the facts of this case.

{¶42} A review of the evidence indicates that Dixson had made threats to kill Ferguson and her family. The day before the shooting, Dixson went to a gun store and purchased ammunition of the same caliber that was fired at Lisa and Ferguson. Dixson parked his truck two blocks away and walked calmly to the house. He then walked up to the car, asked Lisa where Ferguson was. When he did not get the response he wanted, he pulled out the gun from his waistband, where he had concealed it, and started shooting multiple bullets at Lisa. Dixson then turned the gun towards Ferguson and fired multiple bullets at her. When finished, Dixson turned and walked away from the scene back to his truck and drove away. This evidence overwhelmingly indicates that Dixson had engaged in prior planning to go to the home and kill Ferguson and anyone else he happened to meet. He did not ignore Lisa and just shoot at Ferguson, so one can infer that he had previously determined he would kill anyone who interfered with his plan. This evidence does not support that this was a situation that just happened due to circumstances. Rather it indicates a great deal of thought and planning beforehand. Thus, the evidence did not support an acquittal on aggravated murder

and attempted aggravated murder in favor of convictions for murder and attempted murder. Therefore, the trial court did not err in not giving the instruction on the lesser included offenses of murder and attempted murder. The sixth assignment of error is overruled.

{¶43} In the tenth assignment of error, Dixson claims that the prosecutor engaged in misconduct alleging that the prosecutor knew that Palmer was giving false testimony by changing her story and continued with the questioning. When reviewing a claim of prosecutorial misconduct, the pertinent inquiry for an appellate court is 1) whether the prosecutor's actions were actually improper, and 2) if so, were defendant's substantial rights adversely affected. *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990). "Reversal is warranted only if the misconduct 'permeates the entire atmosphere of the trial.'" *State v. Beebe*, 172 Ohio App.3d 512, 2007-Ohio-3746, 875 N.E.2d 985 (4th Dist.), ¶8.

{¶44} Dixson argues that by allowing Palmer to testify differently at trial, the prosecutor engaged in misconduct. At trial, Palmer testified as follows:

> **Q. This person walking across in the direction of your house, did you, did you recognize this person?**
>
> **A. At first, you know I was like, I just figured he was just, you know, as far as he was and then as he got closer, and I seen who he was.**
>
> **Q. And, and was it somebody that you, that you had met previously?**

A.   I've known him.

Q.   Okay.  And how did you know this person?

A.   He was with Tyeesha, or was her boyfriend at one time.  He was my, he lived with Mrs. Ferguson when him and Tyeesha first came to Fostoria.  And then they got an apartment on the other side of the house from me.  So I knew them there.  And then their house, apartment caught on fire and then they moved right around the corner on Union Street from me.

Q.   Okay.

A.   And he was off and on over there through the years that I've known him with Tyeesha and the family.

*  *  *

Q.   And this – do you know the name of the person who, who you saw on Sunday, July 28th?

A.   Calvin.

Q.   Okay.  Do you know his last name?

A.   Dixson.

Q.   Okay.  Is the person you know as Calvin Dixson, is he present in the courtroom today?

A.   Yes.  Calvin's sitting right there.

Tr. 187-88.  Palmer testified that she first realized that it was Dixson when the police showed her a picture.  Tr. 189.  Palmer testified that she recognized the person when he was walking, but she was unable to put a name to the face at that time.  Tr. 193.  However, on cross-examination, Palmer admitted that when

questioned the day of the shooting, she told the police officers that she knew Dixson and the shooter was the same build as him, but that she could not identify him. Tr. 220-21, 228. The inconsistency between the trial testimony and prior statements is a matter of credibility that is to be weighed by the jury. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). The prosecutor did not engage in misconduct by allowing the witness to testify as to identity. Additionally, the inconsistency was brought to the attention of the jury. Finally, there was additional testimony as to the identity of the shooter. Ferguson testified who shot her and Lisa. Danielle testified that Ferguson identified the man approaching the car as Calvin and identified him as the person she saw approaching the car. Given the additional evidence, even if there was an error by the prosecutor, it did not permeate the trial and would be harmless. The tenth assignment of error is overruled.

{¶45} The third, fourth and fifth assignments of error all claim errors in the sentencing. In the third assignment of error, Dixson claims that the trial court erred by failing to merge the sentences and by imposing maximum consecutive sentences. The fourth assignment of error alleges that the trial court failed to follow the statutory guidelines set forth in R.C. 2929.11, 2929.12, 2929.19, and 2953.08. Dixson claims also in the fifth assignment of error that the sentence was

excessive. Since all of these assignments of error are interrelated, they will be addressed together.

{¶46} Dixson first argues that his sentence for aggravated murder and attempted aggravated murder should merge.

> **In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other.  *Blankenship*, 38 Ohio St.3d at 119, 526 N.E.2d 816 (Whiteside, J., concurring) ("It is not necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if both offenses can be committed by the same conduct.  It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both *163 offenses." [Emphasis sic]).  If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.**

> **If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind."  *Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶ 50 (Lanzinger, J., dissenting).**

> **If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.**

> **Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.**

*State v. Johnson*, 128 Ohio St. 3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶¶ 48-51.

{¶47} Dixson claims that since the bullets fired at Lisa could have struck Ferguson, he cannot be convicted of separate offenses. However, this does not take into account the second part of the test, which is whether the offenses were committed by the same conduct. The evidence in this case, as presented through the testimony of Ferguson, was that Dixson opened fire on her mother, then stopped, turned the gun towards her and opened fire on her. The evidence shows that there were bullet holes in the front passenger window and in the rear passenger window. This shows that Dixson changed the direction of his gun from shooting into the front seat to fire into the rear seat. This combined evidence indicates that Dixson had a separate animus for each offense. Thus, the two offenses are not allied offenses of similar import which should merge for the purpose of sentencing.

{¶48} Dixson also alleges that the trial court erred in imposing a maximum sentence for the aggravated murder, by imposing consecutive sentences and by imposing consecutive sentences for the gun specifications. The first issue is whether the trial court erred in imposing a maximum sentence for the aggravated murder. "In imposing a prison sentence, the sentencing court has discretion to state its own reasons in choosing a sentence within a statutory range unless a

-31-

mandatory prison term must be imposed." *State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890, ¶ 16.

> **In Ohio, two statutory sections serve as a general guide for every sentencing. First, R.C. 2929.11(A) provides that the overriding purposes of felony sentencing "are to protect the public from future crime by the offender and others and to punish the offender." To achieve these purposes, the trial court "shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution." *Id.* The sentence must be "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B). \* \* \***
>
> **Second, R.C. 2929.12 specifically provides that in exercising its discretion, a trial court must consider certain factors that make the offense more or less serious and that indicate whether the offender is more or less likely to commit future offenses. \* \* \* [A]n offender's conduct is considered less serious when there are "substantial grounds to mitigate the offender's conduct, although the grounds are not enough to constitute a defense." R.C. 2929.12(C)(4). R.C. 2929.12(C) and (E) also permit a trial court to consider "any other relevant factors" to determine that an offense is less serious or that an offender is less likely to recidivate.**

*Id.* at ¶¶ 17-18.

{¶49} The maximum sentence for aggravated murder, as charged in this case, was life in prison without parole. R.C. 2929.03(A). A review of the sentencing transcript indicates that the trial court considered the statutory sentencing factors before imposing the sentence. Sent. Tr. 12. The trial court then made the following findings.

> **This Court, based upon the evidence it heard, that at least nine shots were fired on the two victims, [Lisa] and [Ferguson], that they were done at point blank range. That both victims were defenseless. That there was no indication of provocation by either victim. And that the evidence indicated there was no reason to kill [Lisa] in any way, shape, or form. In fact, there has been no remorse shown by the Defendant in this case. All these factors lend the court to find that consecutive sentences are necessary to protect the public from future crime or to punish this Defendant, and that consecutive sentences are not disproportionate to the seriousness of Defendant's conduct and to the danger that Defendant poses to the public.**
>
> **\* \* \***
>
> **Pursuant to 2929.03, you're ordered to serve a prison term of life in imprisonment [sic] without parole for the charge of Aggravated Murder. And a mandatory prison term of three years for the firearms specification on Count One at the Ohio Department of Rehabilitation and Corrections.**
>
> **A stated prison term of ten years for the charge of Attempted Aggravated Murder, and a mandatory prison term of three years for the firearms specification on Count Two. All at the Ohio Department of Rehabilitation and Corrections.**
>
> **Said sentences are to be served consecutively for a total sentence of life imprisonment without parole plus 16 years, of which six are mandatory pursuant to [R.C. 2929.14(B)(1)(a)(g)].**

Sent. Tr. 13-15. The maximum sentence was within the range of sentences allowed by statute for aggravated murder. The factors specifically discussed by the trial court, i.e. lack of provocation, extreme harm to the victim, the lack of remorse, and the cold, calculation of the crimes, are supported by the record.

-33-

Thus, this court does not find that the trial court abused its discretion in imposing a maximum sentence for the aggravated murder conviction.

**{¶50}** The imposition of the sentences for the gun specifications is governed by statute.

> **If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.**

R.C. 2929.14(B)(1)(g). Since the trial court is required to impose a sentence for two of the specifications, the trial court did not err by doing so.

**{¶51}** As for the consecutive sentences, the imposition of consecutive sentences is also governed by statute.

> **If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:**

-34-

> **(a)** The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> **(b)** At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> **(c)** The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).

> **On appeals involving the imposition of consecutive sentences, R.C. 2953.08(G)(2)(a) directs the appellate court "to review the record, including the findings underlying the sentence" and to modify or vacate the sentence "if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14 * * * of the Revised Code." But that statute does not specify where the findings are to be made. Thus, the record must contain a basis upon which a reviewing court can determine that the trial court made the findings required by R.C. 2929.14(C)(4) before it imposed consecutive sentences.**
>
> **When imposing consecutive sentences, a trial court must state the required findings as part of the sentencing hearing, and by doing so it affords notice to the offender and to defense counsel. See Crim.R. 32(A)(4). And because a court speaks through its journal,** *State v. Brooke***, 113 Ohio St.3d 199, 2007-Ohio-1533, 863 N.E.2d 1024, ¶ 47, the court should also incorporate its statutory findings into the sentencing entry.**

*State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ___ N.E.3d ___, ¶¶ 28-29.

{¶52} The trial court in this case found that the offenses were part of one or more courses of conduct and that the harm caused by the offenses was so great as to justify consecutive sentences to reflect the seriousness of Dixson's conduct. Sent. Tr. 14. The trial court also found that consecutive sentences were necessary to protect the public and to punish Dixson. Sent. Tr. 13-14. Finally, the trial court found that consecutive sentences in this case were not disproportionate to the seriousness of Dixson's conduct and to the danger he posed to the public. Sent. Tr. 14. These findings were also set forth in the judgment entry of sentence. Doc. 305. Thus, the trial court made all of the required statutory findings to impose consecutive sentences. A review of the record reveals that the findings are supported by the evidence. Therefore, the trial court did not err in imposing consecutive sentences. Based upon the above, the third assignment of error is overruled.

{¶53} Dixson's fourth assignment of error is that the trial court did not consider the statutory factors. As set forth above, and conceded in Dixson's brief, the trial court indicated that it had considered all statutory sentencing factors and specifically mentioned R.C. 2929.02, 2929.03, 2929.11, and 2929.13(D). The trial court specifically addressed some of the factors set forth in R.C. 2929.12. A review of the record indicates that the trial court did not err when it applied the statutory factors of R.C. 2929.12. Thus, the record supports the findings of the

trial court and that the trial court did consider the statutory factors. The fourth assignment of error is overruled.

**{¶54}** In the fifth assignment of error, Dixson claims that his sentence was excessive. "In the context of felony sentencing, an abuse of discretion may be found if the sentencing court unreasonably or arbitrarily weighs the statutory factors." *State v. King*, 2d Dist. Clark Nos. 2012-CA-25, 2012-CA-26, 2013-Ohio-2021, ¶50. As discussed above, the trial court did not unreasonably or arbitrarily weigh the statutory factors. Dixson fails to cite this court to any statute or case which holds that sentences within the statutory range are excessive. The sentences for the gun specification were mandatory. The sentence for the attempted aggravated murder was not the maximum. All of the sentences imposed were within the statutory guidelines. The crux of Dixson's argument is that Ferguson's testimony lacked credibility and thus, the evidence was weak. However, the determination of credibility is left to the jury, who evidently chose to believe her testimony. Additionally, Ferguson's testimony was supported not only by the testimony of Danielle and Palmer, but also by the forensic evidence. Based upon the record before this court, we do not hold that the trial court abused its discretion in imposing the sentence it did. The fifth assignment of error is overruled.

{¶55} In the eleventh assignment of error, Dixson claims that he was denied the effective assistance of counsel.

> **In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." State v. Hester (1976), 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304, paragraph four of the syllabus. When making that determination, a two-step process is usually employed. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." State v. Lytle (1976), 48 Ohio St.2d 391, 396–397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.**
>
> **On the issue of counsel's ineffectiveness, the petitioner has the burden of proof, since in Ohio a properly licensed attorney is presumably competent. See Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 31 O.O.2d 567, 209 N.E.2d 164; * *915 State v. Jackson, 64 Ohio St.2d at 110–111, 18 O.O.3d at 351, 413 N.E.2d at 822.**

*State v. Calhoun*, 86 Ohio St.3d 279, 289, 1999–Ohio–102, 714 N .E.2d 905.

{¶56} Dixson argues that his trial counsel was ineffective for failing to object to the above addressed assignments of error. However, this court has determined that none of the above errors were prejudicial. Thus, any error that might have occurred would not have affected the outcome of the trial. Without a

showing of prejudice, there can be no reversible error from the actions of counsel. The eleventh assignment of error is overruled.

{¶57} Finally, Dixson claims that the cumulative effect of the errors was prejudicial. Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132. A defendant must do more than claim cumulative error, but must offer analysis as to how the errors affected the verdict. *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 197. Additionally, when there are no errors found, the doctrine of cumulative error does not apply. *State v. Markwell*, 5th Dist. Muskingum No. CT2011-0056, 2012-Ohio-3096, ¶ 81.

{¶58} The basis for Dixson's claim is all of the assignments of error addressed above. Since this court has found there were no errors, the doctrine of cumulative error does not apply. The twelfth assignment of error is overruled.

{¶59} Having found no prejudicial error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Seneca County is affirmed.

***Judgment Affirmed***

**ROGERS and SHAW, J.J., concur.**